### DURNFORD vs. JOHNSON.

THIS was a suit against the indorser of a pro- An ineffec
missory note. The maker, at the time it was gi- tual attempt
to present
ven, resided in New-Orleans, from whence the the note to
note bore date. Before it became due, he went to does not suf-
Europe, and on his return went to reside, with fice to charge
the indorser,
his wife's mother, in the county of the German
Coast.

THE note, which was deposited in the bank for
collection, was, on the last day of grace, handed to
a notary, with a charge to be strict in making the
protest. He accordingly went to the ferry, in or-
der to cross the river—but was told the wind was
too high to admit of his going over, whereupon
he rode a considerable distance up the river with-
out being able to cross, and was informe dit would

be in vain to go higher, as no craft were to be had. This being late on Saturday, he declined proceeding farther : the next day he returned home, and on Monday morning made a protest in his office, and gave notice to the indorser.

THERE was not any evidence of any other call, or of any demand, on the maker.

ON this, *Hennen*, for the defendant, prayed for a non-suit, and the Court intimating an opinion that the plaintiff had not made out his case, and ought to be non-suited—*Depeyster* and *Porter*, for the plaintiff, declined to submit to a non-suit, Hennen objected to the note and protest going to the jury.

*By the Court.* The plaintiff having the right, notwithstanding the opinion of the Court, to put his case to the jury, it follows that the jury must have all the writings which have been properly offered to them.

THE Court charged the jury, that the indorser, being only liable on the default of the maker, the latter ought to be called upon before the former was resorted to, and that the plaintiff having neglected to do so, was not entitled to their verdict.

THE jury could not, however, agree upon a verdict ; and one of them was withdrawn by consent. See 1 *Gould's Espinasse*, 96-7-8, *and the cases there cited.*

HE admits he has no claim to citizenship by birth, nor by naturalization, under the acts of congress to establish an uniform rule of naturalization. 6 *Laws U. S.* 74 & 7 *Laws U. S.* 136; having never complied with the formalities required, by any of these laws.

HE contends, however, that natural birth, and a compliance with the formalities of these laws, are not the only modes of acquiring the citizenship of the United States: that the constitution itself has provided a third, viz. the admission into the. Union, of a state of which one is a citizen.

BY the 3d section of the 4th article of the constitution of the United States, it is provided that " new states may be admitted by the congress into the union"—and the 2d section of the same article directs that " the citizens of each state shall be en- " titled *to all the priviledges and immunities of* " *citizens in the several states.*" It is impossi-

Z

Spring 1812.
I. District.

Desbois's
Case.

ble to give to the provisions of these two sections their effect, in the opinion of the counsel for the motion, without recognising, as a constitutional principle, the position that, on the admission of a new state into the union, its citizens, the members who compose it, become *ipso facto* entitled to all priviledges and immunities of citizens in the several states, consequently to those of citizens of the United States.

In the confidence that this position will be recognized by the Court, he has built his hopes of success on the establishment of the following facts:

1. That the state of Louisiana was, on the 30th of April last, "declared to be one of the United " States of America, and admitted into the union, " on an equal footing with the original states, in " all respects whatsoever."

2. That at the time, he was a citizen of the state of Louisiana.

To establish his citizenship of the state of Louisiana, he has proved that some time in the year 1806, he removed to, and settled with his family in, the city of New-Orleans, within the territory of Orleans, in contemplation of the enjoyment of all the advantages, which the laws of the territory, and of the United States, held out to foreigners removing into that territory, which he has ever since considered as his adopted country.

That on the 16th of February, 1811, " the *in-*
" *habitants* of all that part of the territory or coun-
" try, ceded under the name of Louisiana, by the
" treaty made at Paris on the 30th of April, 1803,
" between the United States and France, contain-
" ed within the following limits" (including the
city of New-Orleans) were " authorised to form,
" *for themselves,* a constitution or state govern-
" ment:" that accordingly, a constitution was
formed, and the inhabitants of that part of the for-
mer territory of Orleans, which includes the city of
New-Orleans, became an independent state, by the
name and stile of the state of Louisiana, of which,
in his judgment, he is a component member, a ci-
tizen.

THERE cannot be any doubt of the correctness
of this reasoning, if the word *inhabitants,* used in
the part of the act of congress cited, is to be un-
derstood *lato sensu,* so as to comprehend every
inhabitant, actually settled: but it is contended
this word is to be taken in a *restricted sense,* so as
to exclude such inhabitants, as were not in the
country at the cession.

THE grounds on which it is expected that the
latter interpretation will prevail, are :

1. THAT it was only in favour of the persons
who inhabited the country, at the time of the ces-
sion, that the incorporation into the union, and the

Spring 1812.
I. District.

Desbois's
Case.

admission to the rights of citizens of the United States, were stipulated in the treaty. *Art.* 3.

2. THAT the promise, made by congress in 1805, 7. *Laws U. S.* 283, " That as soon as it " shall have been ascertained by an actual census, " or enumeration of the inhabitants of the territo- " ry of Orleans, taken by proper authority, that " the number of free inhabitants, included there- " in, shall amount to 60,000, they shall thereup- " on be authorised to form for themselves a con- " stitution or state government and be admitted " into the union, upon the footing of the original " states, in all respects whatsoever," was accom- panied with a declaration that the admission should be made " conformably to the provisions of the 3d " article of the treaty." Therefore no person can claim the benefit of this new promise, who could not that of the stipulation in the treaty.

3. THAT the persons, in whose favour the act of congress of the 16th of February, 1811, was made, are described as " the inhabitants of all that " part of the *territory or country ceded, under* " *the name of Louisiana, by the treaty made at* " *Paris, &c.* contained within the following lim- " its ;" whilst it would have been far easier to have said : " the inhabitants of all that part of the *terri-* " *tory of Orleans*, contained within the following " limits, &c." if congress had not intended, by a reference to the treaty, the more markedly to point

out those for whose advantage the law was passed, viz. the inhabitants of the territory ceded, at the cession.

4. This construction is corroborated by the distinction made by congress in one of their acts. (7 *Laws U. S.* 51.) They there extend the right of owning ships and vessels of the United States, " to the inhabitants of the ceded territory, *who* " *were residents thereof on the* 30*th of April,* " 1803 :" clearly excluding those who had arrived since, and were consequently, as it is contended, no part of these inhabitants, in whose favour the stipulation in the treaty was made.

This interpretation is resisted on these grounds:

1. That the word " the inhabitants of all that " part of the territory or country ceded," are plain and explicit : and that the Court ought not to permit itself to resort to any rule of construction, when the meaning of the legislator is not expressed in words of a dubious meaning.

2. That if the expression was a doubtful one, it would be fairer to look for a clue, in the other parts of the act, than to seek it in other acts, passed several years before, and by other legislatures,— and that it is safer to judge of the legislator's meaning by what he has *done*, than by what he has *said*. Whatever congress may have *said*, as to the persons entitled to be members of the new state;

they have actually *vested* the right of composing the body, who was to frame the constitution, in some inhabitants who arrived since the cession.

3. That to construe the word *inhabitants*, so as to include all *actual* inhabitants, at the time the word was used, is not to construe it *lato sensu*, but to give it its plain and obvious meaning only.

4. That if the word be ambiguous, the Court is to look for the meaning of the legislator, in the usage of the country before the passage of the act. Common usage being the best interpreter of the law. *Si enim de ambiguitate legis quæratur, imprimis inspiciendum erit quo jure civitas* RETRO *in ejusmodi casibus uta sit. Stabilia ac optima legum interpres sit consuetudo. Pand. lib.* 1, *tit.* 3, *l.* 37.

5. That construction ought, *cœteris paribus*, to preponderate, by which, in the charter of the sovereign, his beneficence shall have the most extention. *Beneficium imperatoris quod a divina scilicet ejus indulgentia profiscicitur quam plenissime interpretare debemus. Did. lib.* 1, *tit.* 4, *l.* 3.

I. It is true that if the words " the inhabitants " of all that part of the territory or country ceded" stood aloof from others, which may give them another meaning, the Court would not resort to any rule of construction. *Quoties in verbis nulla est ambiguitas, ibi nulla expositio contra verba fienda*

*est.* 2 *Saund.* 157. But to admit that the words are susceptible of that meaning only, in which the counsel for the motion understand it, is to give up the whole question.

II. Surely, the legislator's meaning will be more safely ascertained from a comparison of the different parts of a statute; but it is also proper to consider all other statutes *in pari materia;* and as *actions* denote intentions more forcibly than *words*, what the legislator has *done*, will be better evidence of his will, than what he has *said*.

The doubt which arises as to the meaning of the word *inhabitants*, used in the first part of the first section of the act of 1811, when we compare it with antecedent acts, must be much weakened, when we do so, with what is *said* and *done*, in the second section.

We are to take notice that in the first, the persons who are to constitute the new state are pointed out. The object of the second is, to select from among them those who, on the day of election, are to pronounce the will of the future citizens, in the choice of their representatives. Here we find that inhabitants of the territory ceded, arrived since the cession, even within two years, are authorised to vote. The inference is very strong that, since they are thus called, by an express provision, with those who were in the country at the cession, to

co-operate in the formation of the constitution, they were intended by congress to have the same rights, at least, as those of the inhabitants at the cession, who for want of certain qualifications were excluded from the poll.

If the inhabitants, who were here at the cession, were the exclusive object of the congress's attention and favour in the *first* section, it is strange that in the *second*, the most important, they should be entirely pretermitted. In pointing out the voters, no right is given to them as such.

III. IV. Let us now seek the meaning of the word, in the laws and usages of the country before the passage of the act.

The act of congress, authorising the formation of the constitution of this state, 10 *Laws U. S.* 322, was almost litterally copied from that which authorised that of the state of Ohio. 6 *Laws U. S.* 120. In the first section of the latter, "the *inha-* " *bitants* of the eastern division of the territory " north-west of the river Ohio," are authorised to form, for themselves, a state constitution." In the 4th section, the persons entitled to vote for members of the convention, are described—first, all male citizens of the United States—next, all other persons having, &c.

The word *inhabitants*, in the first section of this act, must be taken *lato sensu*, it cannot be

restrained so as to include citizens of the United
States only; for other persons are afterwards called
upon to vote. There is not any treaty, or other
instrument, which may be said to control it. Eve-
ry attempt to restrict it, must proceed on princi-
ples absolutely arbitrary. If the word is to be
taken *lato sensu* in the act passed in favour of the
people of one territory, is there any reason to say
that we are to restrain it, in another act, passed for
similar purposes, in favour of the people of ano-
ther territory ?

It is one of the oldest principles of 'Anglo-
American jurisprudence, that the soil of the Uni-
ted States is that of UNIVERSAL NATURALISA-
TION. An alien in America before the revolution,
was entitled to many more rights than an alien in
England. 1. By the very act of *migration* to, and
settlement in, America, he became *ipso facto* a
denizen, under the express stipulations of the co-
lonial charters (all of which, it is believed, contain-
ed similar clauses) whereby it was stipulated, for
the better encouragement of all who would engage
in the settlement of the colonies, that they, and
every one of them, that should inhabit the same,
should and might have all the priviledges of free
denizens or persons natives of England. *Q. Eli-
zabeth's charter to sir W. Raleigh.* 2. By the
same act of migration, he had a right to be natura-

A A

SPRING 1812.
I. District.

DESBOIS'S
CASE.

lised under the sanction of a pre-existing law, made not only for the benefit, but for *the encouragement*, of all in a similar situation with himself. The operation of these laws was *immediate* not *remote:* he became a denizen, as of right, instantly ; he became naturalised, upon payment of the legal fees for his letters of naturalisation, and taking the oaths. 1 *Tucker's Blackstone, part 2, app.* 99.

AFTER the revolution, this principle was engrafted in the constitutions of most of the states. Every foreigner, says the 49th article of that of North Carolina, who comes to settle in this state, having first taken an oath of allegiance to the same, may purchase, and by other lawful means, acquire, hold, and transfer land and other real estate, and after one year's residence, shall be deemed a free citizen.

By the adoption of the constitution of the United States, the right of aliens to become citizens, was by no means intended to be taken away. On the contrary, it is expressly provided that " con- " gress shall have power to establish *an uniform* " *rule* of naturalisation." *Art* 1, *sect.* 8. Here we may observe that congress are authorised to prescribe the *mode*, by which aliens are naturalised ; but it never was intended to authorise them to take away the *right*. For, among the acts of misrule, alledged against George III. in the declaration

of independence, it is asserted that "he has endea-
" voured to prevent the population of these states ;
" for that purpose, obstructing the law for the na-
" turalisation of foreigners, and refusing to pass
" others to encourage their migration thither."
Every alien, coming to the United States in time
of peace, therefore, acquires an inchoate right un-
der the constitution to become a citizen. 1 *Tuck-
er's Blackstone, part* 2, 99, 100.

EVERY European nation possessed of colonial
establishments in America, except, perhaps, the
Spanish, admitted foreigners to naturalisation in
them, without difficulty ; and whatever might be
the conduct of Spain in her other American colo-
nies, in Louisiana, naturalisation was obtained
with great facility. Foreigners were permitted to
settle, lands were allotted them, and the expence
of their migration was often borne by the crown,
who in many instances supplied them with the
means of subsistence during the infancy of their
establishments. *See Gayoso's instructions and Ca-
rondelet's contracts with Bastrop and Maison
Rouge. Land laws U. S. appendix* 63, 67, 70.
Frequent instances occurred, under the Spanish
government, of such naturalised citizens, being
appointed to offices of high trust and profit.

IT is, therefore, correct to conclude that fo-
reigners who migrated into the territory of Or-

SPRING 1812.
I. District.

DESBOIS'S
CASE.

leans after the cession, acquired, by the very act of migration, an inchoate right of naturalisation or territorial citizenship, under the particular laws of the land (we mean those by which the country had been regulated under the dominion of Spain, and which remained unrepealed) and the general principles of the American government.

In 1805, in extending to their newly acquired possession the second grade of territorial government, congress vested new rights in the inhabitants; and as these rights expressly extended to future immigrants, held out new inducements to foreigners disposed to migrate—inducements to which is perhaps due, in a considerable degree, the extraordinary increase of the population of the territory.

The rights which foreigners acquired before 1805, in migrating into the territory, were that of purchasing and holding land, and consequently establishing themselves thereon.

It does not appear that they were under any disqualification, express or implied, from holding any office in the territorial government. The contrary is to be presumed; for their eligibility (after a certain period) to seats in the legislative council, had been declared. That body was to be composed of thirteen of the most fit and discreet *persons* of the territory, chosen among those holding

real estate therein, and who shall have resided *one* year at least in said territory. 7 *Laws U. S.* 113.

In 1805, to those rights were added :

1. That of voting for members of the house of representatives, after a residence of two years.

2. That of being eligible as a representative, after three,

3. And as a member of the legislative council— *Ordinance of* 1787.

They were not disqualified from holding any office.

'It is true some real property was required, to exercise those rights ; but the same property qualification was indispensable to the inhabitants of the ceded territory residing there at the session.

So that, as to the rights of a territorial citizen, inhabitants arrived since the cession, were *on a perfect equality* with those who were residents at the session.

Persons, endowed by the laws of the territory and of the union, with such extensive, such valuable rights, could not be considered on the footing of aliens, in any sense of the word.   They had acquired civil rights, of which they could not be wantonly deprived, without a violation of some of the most sacred principles of political justice, as well as of moral obligation.   They might emphatically call that country *their own,* in which they

SPRING 1812.
I. District.

DESBOIS'S
CASE.

were permitted to exercise such rights—rights for which some of them had paid a valuable conside, ration.

THOSE who have served the territory in the legislature, or accepted offices, have, in many instances, forfeited their civil rights and become aliens in the country from which they migrated. *La qualité de Français*, that is to say, French citizenship, shall be lost : 1. By naturalisation acquired in a foreign country : 2. By *the acceptance of public functions*, unauthorised by the emperor, *conferred by a foreign government*. 3. By every establishment in a foreign country, without the intention of returning. *Napoleon Code, livre* 1, *chap.* 2, *sect.* 1, *art.* 17.

SURELY, he, who thus engaged in the service of his adopted country, did it in a confidence, which the American government had excited, and consequently was bound not to disappoint wantonly, that its protection should not be withdrawn without cause; that it should not betray him, by sending him back, a stranger in the whole world, liable to be taken and delivered to the very sovereign whose resentment he had excited, by an attempt to throw off his allegiance.

IF an individual, who thus forfeited his rights in his native country, is not, by the late change of government, a citizen of the state of Louisiana, he

is *an alien* TO ALL INTENTS and PURPOSES WHATEVER. When he finds himself thus thrown away, an outcast upon the world, he may well address congress thus : " You have declared me *an* " *alien.* On a war breaking out with my former " country, you will consider me as AN ALIEN " ENEMY. If ever the same laws are enacted as " were passed in 1798 (4 *Laws U. S.* 143) I may " be shipped away. I settled in one of your ter- " ritories, in which your laws offered me a domi- " cil, the right of holding land, elective franchise, eli- " gibility to every office capacity to exercise legisla- " tive functions : brilliant prerogatives from which " my dazzled mind could not by any possibility " separate the quality of a citizen. I have taken a " wife, children are born to me. These are citi- " zens. Shall I take them with me out of the " only country, in which they have any right, and " wander with them, outcast and forlorn, till I " find an hospitable nation, from whose genero- " sity we may obtain, what we vainly claimed from " your justice. Or shall I part from them and " with the civil rights, of which I am despoiled, " lose those of a husband and a father ?

" IT is true I cannot turn to any part of your " statutes in which the citizenship of the United " States was *expressly* promised to me. But

" The obligation of promises, says archdeacon " Paley, depends upon the expectations, which

SPRING 1812.
I. District.

DESBOIS'S
CASE.

" we knowingly and voluntarily excite; conse-
" quently any action or conduct towards another,
" which we are sensible excites expectations in
" him, is as much a promise and creates as strict
" an obligation, as the most express assurances.
" Taking, for instance, a kinsman's child, and
" educating him for the heir of a large fortune, as
" much obliges us to place him in that profession,
" or to leave him such a fortune, as if we had giv-
" en him a promise to do so, *under our hands and*
" *seals. Paley's Ph.* 99, 100.

" Now, if nations are bound by moral obliga-
" tions, receiving a foreigner, allowing him to pur-
" chase land, bestowing on him elective franchise,
" passing laws to authorise him to exercise legis-
" lative functions, that is to say, the sovereign
" power of the country, naturally excite expecta-
" tions, which cannot be wantonly disappointed,
" without a flagrant breach of faith. The expec-
" tation which your conduct excited in me was,
" that I should never be reduced to the condition
" of an alien, without some fault on me."

V. THE Court recognizes the principle that
the *act to enable the people of the territory of
Orleans to form a constitution, &c.* ought to have
a *liberal* construction, and that, without the ut-
most necessity, no part of it ought to be so inter-
preted so as to destroy acquired *rights*. In ordi-
nary affairs, the benignity of the law, says Lord

Bacon, is such that when, to preserve the principles and grounds of the law, it deprives a man of his remedy, it will rather put him a better degree and condition than in a worse, *nam quod remedio destituitur, ipsa ratione valet,* SI CAUSA ABSIT. *Bacon's Elem. c. 9.* If a man shall not lose his *remedy* without his fault, shall he be presumed to lose his *right?* The presumption, then, must be, that congress, in establishing a government, which necessarily must have deprived certain individuals of their civil rights, would be inclined to give them better—rather raise them to the high situation of a citizen of the United States, than to degrade them to the degree and condition of an alien.

ON the best view of the case, we are of opinion that the reference to the treaty, and the distinction made, in favour of the inhabitants, who were here at the cession, in the sole instance of owning vessels of the United States, are not sufficient circumstances, from which we may imply the intention of congress to exclude from the rights of a citizen of the state of Louisiana, *any person actually and bona fide an inhabitant* of that part of the territory of Orleans, described in the act, at the time of its passage.

DESBOIS'S
CASE.            *Duncan, Brackenridge,* and *Gales,* for the mo-
tion.

*Robertson, Dick,* and *Wilson,* contra.