## BOYD *v.* NEBRASKA *ex rel.* THAYER.

ERROR TO THE SUPREME COURT OF THE STATE OF NEBRASKA.

No. 1208. Argued December 8, 1891. — Decided February 1, 1892.

Boyd was born in Ireland in 1834, of Irish parents. His father emigrated to the United States in 1844, with all his family, and settled in Ohio, in which State he has since resided continuously. In 1849 the father duly declared his intention to become a citizen of the United States, but there is no record or other written evidence that he ever completed his naturalization by taking out his naturalization certificate after the expiration of the five years. For many years after the expiration of that time, however, he exercised rights and claimed privileges in Ohio, which could only be claimed and exercised by citizens of the United States and of the State. The son, on attaining majority, voted in Ohio, under the belief that his father had become a citizen. In 1856 he removed to Nebraska, in which State he resided continuously until the commencement of this action. He voted there at all elections, held various offices there which required him to take an oath to support the Constitution of the United States, served in the army during the war, was a member of a convention to frame a state constitution, was mayor of Omaha and, after thirty years of unquestioned exercise of such rights and privileges, was elected governor of the State of Nebraska, receiving a greater number of votes than any other person voted for. He took the oath of office, and entered on the discharge of its duties. His predecessor, as relator, filed an information in the

Supreme Court of Nebraska, in which were set forth the facts as to the declaration of intention by Boyd's father, and it was further averred that the father did not become a citizen during the son's minority, nor until the October term of the Court of Common Pleas in Muskingum County, Ohio, in the year 1890, when the son was 56 years of age, and it was claimed that Boyd, the son, never having himself been naturalized, was not, at the time of his election, a citizen of the United States, and was not, under the constitution and laws of Nebraska, eligible to the office of governor of that State, and the relator therefore prayed judgment that Boyd be ousted from that office, and that the relator be declared entitled to it, until a successor could be elected. To this information the respondent, in his answer, after stating that his father, on March 5, 1849, when the respondent was about fourteen years of age, made before a court of the State of Ohio his declaration of intention to become a citizen of the United States, and averring "that his father for forty-two years last past has enjoyed and exercised all of the rights, immunities and privileges and discharged all the duties of a citizen of the United States and of the State of Ohio, and was in all respects and to all intents and purposes a citizen of the United States and of the State of Ohio," and particularly alleging his qualifications to be a citizen, and his acting as such for forty years, voting and holding office in that State, further distinctly alleged " on information and belief, that prior to October, 1854, his father did in fact complete his naturalization in strict accordance with the acts of Congress known as the naturalization laws so as to admit and constitute him a full citizen of the United States. thereunder, he having exercised the rights of citizenship herein described, and at said time informed respondent that such was the fact." To this answer the relator interposed a demurrer, and on these pleadings the court below entered a judgment of ouster against Boyd, to which judgment a writ of error was sued out from this court. *Held*,

(1) That, as the defence relied on arose under an act of Congress and presented a question of Federal law, this court had jurisdiction to review it (FIELD, J., dissenting) ;

(2) That the fact that the respondent's father became a citizen of the United States was well pleaded, and was admitted by the demurrer;

(3) That upon this record Boyd had been for two years, next preceding his election to the office of governor, a citizen of the United States and of the State of Nebraska;

(4) That where no record of naturalization can be produced, evidence that a person having the requisite qualifications to become a citizen did in fact and for a long time vote, and hold office, and exercise rights belonging to citizens, is sufficient to warrant a jury in inferring that he has been duly naturalized as a citizen.

And it was further *Held*, by FULLER, C. J., and BLATCHFORD, LAMAR, and BREWER, JJ.:

(5) That, the Supreme Court having denied to Boyd a right or privilege

existing under the Constitution of the United States, this court had jurisdiction, on that ground also, to review the judgment of the Supreme Court of Nebraska;

(6) That, even if the father did not complete his naturalization before the son attained majority, the son did not lose the inchoate status which he had acquired through his father's declaration of intention to become a citizen, and that he occupied in Nebraska the same position which his father would have occupied had he emigrated to that State;

(7) That within the intent and meaning of the acts of Congress he was made a citizen of the United States and of the State of Nebraska under the organic and enabling acts of Congress, and the act admitting that State into the Union;

(8) That Congress has the power to effect a collective naturalization on the admission of a State into the Union, and did so in the case of Nebraska;

(9) That the admission of a State on an equal footing with the original States involves the adoption, as citizens of the United States, of those whom Congress makes members of the political community, and who are recognized as such in the formation of the new State with the assent of Congress;

(10) That the rule prescribed by § 4 of the act of April 14, 1802, 2 Stat. 155, c. 28, was to be a uniform rule, and there was no reason for limiting such a rule to the children of those who had been already naturalized, but, on the contrary, the intention was that the act of 1802 should have a prospective operation.

THE case was stated by the court as follows:

On the 13th of January, A.D. 1891, leave was granted to John M. Thayer, by the Supreme Court of the State of Nebraska, to file an information against James E. Boyd to establish the relator's right to the office of governor of that State, and to oust the respondent therefrom.

It appears from the record that the attorney general of the State refused to prosecute the action, and this is so stated in the information, which then alleges:

." 1. On the Tuesday next succeeding the first Monday of November of the year 1888 he, the said John M. Thayer, was and for more than two years next preceding that time had been a citizen of the United States and of this State, and then had and now has all the qualifications required by law to hold the office of governor of the State of Nebraska.

" 2. At the general election of this State, at the date afore-

said, for the election of governor and all state officers in accordance with the provision of the constitution and laws of this State, he was duly elected governor; that he duly qualified and entered upon the duties of said office on the first Thursday after the first Tuesday in January, 1889, and ever since then has exercised and now exercises the duties of said office.

" 3. That his said election and oath of office as governor made it his duty to hold his office for the term of two years from the first Thursday after the first Tuesday in the January next after his election and until his successor should be elected and qualified.

" 4. That there was held another general election of this State on the Tuesday next succeeding the first Monday of November in the year 1890 for the election of governor and other officers, and the returns of said election for the officers of the executive department were, as required by the constitution, sealed up and transmitted by the returning officers to the secretary of State, directed to the speaker of the house of representatives, who did, on the 8th day of January, 1891, immediately after the organization of the house and before proceeding to other business, open and publish the same in the presence of a majority of each house of the legislature, who were for that purpose assembled in the hall of the house of representatives.

" 5. That said returns, so sealed up, transmitted, opened and published, showed that the whole number of votes cast at said general election for the several persons voted for for the office of governor aggregated 214,090; that of said number of votes so cast for governor James E. Boyd received 71,331, J. H. Powers received 70,187, L. D. Richards received 68,878, and there were scattering ,3694; and James E. Boyd, being the person having the highest number of votes for the office of governor, was by said speaker declared duly elected governor for the term of two years from the first Thursday after the first Tuesday of January, 1891, and until his successor should be elected and qualified; and relator exhibits herewith and makes a part hereof a duly certified and authenticated copy of said returns.

" 6. That thereupon the said James E. Boyd took the oath of

office required to be taken by the executive officers before they enter upon their official duties, and has usurped and invaded the office of governor of Nebraska, and has unlawfully attempted and now unlawfully attempts to hold the said office and perform the duties of governor of Nebraska, and will continue so to do unless ousted therefrom by the judgment of this honorable court.

" 7. But the relator further gives the court to understand and be informed that the said James E. Boyd was not at the time of his said pretended election, on the said Tuesday next succeeding the first Monday of November, 1890, a citizen of the United States, and because he was not as aforesaid then a citizen of the United States he was not then eligible to the office of governor of this State, and as yet no person eligible thereto has been elected and qualified to succeed your informant, and it is the bounden duty of the relator to hold and continue in the office of governor until some person eligible thereto shall be elected and qualified as his successor; that in truth and in fact the said James E. Boyd was born in Ireland, of alien parents, in about the year 1834; that he was brought to this country when about ten years of age by his father, whose name was and is Joseph Boyd, who settled in about the year 1844 at Zanesville, Muskingum County, in the State of Ohio, where he has ever since resided and now resides; that the said Joseph Boyd, father of the said James Boyd, has never since he came to this country and settled at Zanesville, Ohio, resided at any other place.

" That on the fifth day of March, 1849, at, in and during the February (1849) term of the common pleas court of said Muskingum County, in the State of Ohio, the said Joseph Boyd, a native of Ireland and father as aforesaid of the said James E. Boyd, and when the said James E. Boyd was about fifteen years of age, in open court declared it to be his *bona fide* intention to become a citizen of the United States and to renounce and abjure forever all allegiance and fidelity to every foreign prince, potentate, state or sovereignty whatsoever, and particularly the Queen of Great Britain and Ireland; and the following is a true and full copy of the journal entry from the records

of the said common pleas court of the said Muskingum County, Ohio, showing such declaration of intention, to wit:

[Here follows the entry referred to.]

"And your informant has and exhibits to the court a duly certified transcript of the said record entry as found on page 187 of said journal, vol. 'T.'

"8. And relator further gives the court to understand and be informed that the said Joseph Boyd, father aforesaid of said James E. Boyd, never while the said James E. Boyd was under the age of twenty-one years applied to be admitted to become a citizen of the United States, and was never naturalized and never did become a citizen of the United States while the said James E. Boyd was under the age of twenty-one years; that at, in and during the October (1890) term of the said common pleas court, held within and for the county of Muskingum, in the State of Ohio, and never before and not until after the said James E. Boyd was upwards of twenty-one years of age, and not until he was of the age of fifty-six years, the said Joseph Boyd, father of the said James E. Boyd, a native of Ireland, and up to that time and then a subject of the Queen of Great Britain and Ireland, appeared in open court and made application to be admitted to become a citizen of the United States and proved to the satisfaction of the court that he declared his intention to become a citizen of the United States on the fifth day of March, 1849, before the court of common pleas of Muskingum County, Ohio, and also produced his certificate of such declaration of intention, and that he had resided within the limits of the United States five years then last past and for one year at least then last past within the State of Ohio, and that during that time he had behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same; and thereupon the said Joseph Boyd made solemn oath that he would support the Constitution of the United States, and that he did absolutely and entirely renounce and abjure all allegiance and fidelity to every foreign prince, potentate, state or sovereignty, and particularly to Great Britain and Ireland and the Queen of England, whose subject

he then was; and, the court being then satisfied that the said
Joseph Boyd had complied with the laws of the United States
relating to the naturalization of aliens, it was ordered that he
be, and he then was, admitted to become a citizen of the United
States, and a certificate was then issued to him; and before
that time he had never been and was not a citizen of the United
States; and the following is a copy of the journal entry from
the records of the common pleas court of said Muskingum
County, Ohio, showing such application of the said Joseph
Boyd to be admitted to become a citizen and his admission to
citizenship of the United States, to wit:

[Here follows the record referred to.]

"And the relator has and exhibits to the court a duly certi-
fied transcript of the said record entry as found on page 145
of said journal, volume 42.

"9. And the relator further shows that careful and diligent
search has been made by the clerk of the court of common pleas
of said Muskingum County, Ohio, through all the records of his
said office, and that the only record or journal entry in any shape
or form in said court and in the records thereof of or concern-
ing the declaration of intention to become and application of
the said Joseph Boyd to be admitted a citizen of the United
States in said office is found upon page 187 of Journal 'T' and
upon page 145 of Journal 42, and the only record or journal
entries in said office of the naturalization of said Joseph Boyd
is found upon said page 145 of said Journal No. 42, and that
said two entries constitute the only and entire record of the
naturalization of said Joseph Boyd, as shown by the records
and journals of said court; and the relator exhibits and shows
to the court the certificate of the clerk of said court, duly signed
and made under oath, showing such facts.

"10. And the relator further shows that the said James E.
Boyd has never at any time declared his intention to become
a citizen of the United States, nor has he ever made applica-
tion to be admitted as a citizen of the United States, but he
has ever remained an alien and a subject to the Queen of Great
Britain and Ireland.

"And relator says by reason of the premises and by reason

of the legal disqualification of the said James E. Boyd to hold said office of governor the said election for governor was and is null and void.

"11. And the relator further shows that, notwithstanding the fact that the said James E. Boyd was and is ineligible to the office of governor as aforesaid, and notwithstanding the fact the relator is bound to continue in and hold the office of governor and is entitled to the peaceable and undisturbed possession of the office of governor and the furniture and records thereof, yet the said James E. Boyd has usurped and invaded the office of governor of Nebraska unlawfully and has unlawfully undertaken to perform the duties of said office; and the relator has refused and refuses for the reason hereinbefore stated to surrender said office to said defendant and will not do so unless required so to do by the judgment of this honorable court, upon due hearing had.

"Wherefore the said John M. Thayer prays judgment that the defendant, James E. Boyd, be declared not entitled to said office, and that he be ousted therefrom, and that he, the said John M. Thayer, be declared entitled to such office until such time as some person eligible thereto shall be elected and qualified as his successor, and that the said James E. Boyd be enjoined from invading the said office and from interfering in any manner with the furniture, records or anything therein or pertaining thereto, or in any manner interfering or intermeddling with the relator in the performance of the duties of governor of Nebraska."

The respondent, on the 16th of February, 1891, filed his motion to dismiss the cause for that the relator had no right, title or authority in law to institute or maintain the action; that the petition did not state grounds sufficient to constitute a cause of action; that the petition showed on its face that respondent was the duly elected, qualified and acting *de jure* governor of the State, and entitled in law to hold that office and bound to discharge the duties thereof for and during the term of two years from and after January 8, 1891. This motion was overruled, and the respondent was ruled to answer, which he did as follows:

"Now comes the respondent, James E. Boyd, and admits that the attorney general of this State refuses to prosecute this action, and protests and insists and avers the fact to be that the information herein is insufficient in law to require the respondent to make answer thereto, for that it does not show that said John M. Thayer has any right or title to the said office of governor of Nebraska, or that he has any right, title or authority to institute, maintain or prosecute this action, and for that said information does not state facts sufficient to constitute a cause of action.

"Further answering, respondent admits the allegations of the first, second, third, fourth and fifth paragraphs of the information, except as hereinafter shown. Further answering, said respondent shows to the court that said John M. Thayer was, at the regular state election held in the State of Nebraska in November, A.D. 1888, elected to the office of governor of this State for a term thereof commencing in January, 1889, and that upon the canvass of the votes cast at said election he was duly declared to be so elected; that the term of said office is fixed by the constitution to commence on the first Thursday after the first Tuesday in January succeeding the election and continues for a period of two years and until his successor shall be elected and qualified; and the respondent further says that the laws of Nebraska at all the times herein mentioned provided that if a qualified incumbent of the office holds over by reason of the non-election or non-appointment of his successor he shall qualify within ten (10) days from the time at which his successor, if elected, should have qualified, by taking the oath of office, and executing and having approved and filed for record his official bond in the sum of fifty thousand ($50,000.00) dollars, conditioned for the faithful performance of the duties of the office, as by law required.

"Respondent further says that the said John M. Thayer continued as the actual incumbent of said office down to the time when this respondent qualified as governor of this State, on the 8th day of January, 1891, which was the first Thursday after the first Tuesday in January succeeding the election in question. Respondent further says that the said John M.

Thayer has never since the 8th day of January, 1891, qualified anew as governor of the State of Nebraska; that he has not since that date taken or filed the official oath required by law, nor has he had his official bond executed or approved or filed for record, as by law required, to qualify him anew if no party was elected to hold said office of governor from and after the said 8th day of January, as he alleges in his information, but which respondent denies; and in this behalf further alleges the fact to be that after the said 8th day of January, 1891, the respondent entered into the office of governor of the State of Nebraska, and the said John M. Thayer from that time and thereafter wholly surrendered, abandoned and removed from said office, and has not since in any manner, directly or indirectly, occupied or possessed the same or assumed or pretended to assume to perform any of the functions thereof, but wholly surrendered the same and vacated said office.

"Answering the sixth paragraph of said information the respondent admits that after his election to the said office and the canvass of the returns, and after he had been declared elected to the said office by the speaker of the house of representatives in the presence of a majority of the legislature, as required by law, he on the 8th of January, 1891, took the oath of office, executed and filed his official bond, did all other acts and things required by law of him to be done, to qualify and entitle him to enter into the possession, use and enjoyment of said office and to discharge the duties thereof, and the respondent denies that he has usurped or invaded the said office or unlawfully attempted at any time to hold said office and to perform the duties thereof, but avers the fact to be that at and from the commencement of the term of his said office, from January 8th, 1891, he has been and now is the duly elected and qualified governor of the State of Nebraska, in the quiet, legal and actual possession and enjoyment of said office and discharging its duties; that he has been recognized so to be by all of the departments and officers of the state government.

"And the respondent further avers the fact to be that the said John M. Thayer ceased to be the incumbent of said office in law and in fact with the expiration of the 8th day of Janu-

.ry, A.D. 1891, and prior to the commencement of this action.

"Answering the eighth paragraph of said information, the respondent denies all the allegations thereof except that he was born in Ireland, of alien parents, in the year 1834; that he was brought to this country, when about ten years of age, by his father, Joseph Boyd, who settled about the year 1844 in Belmont County, Ohio, where he resided for several years, and thereafter removed to Zanesville, Muskingum County, Ohio, where he has ever since resided.

"Respondent also admits that his father, on or about March 5, 1849, when respondent was about 14 years of age, declared his intention to become a citizen of the United States and to renounce and abjure forever all allegiance and fidelity to every foreign prince, potentate, state and sovereignty whatever, and particularly the Queen of Great Britain and Ireland, and that the alleged exemplification of the record thereof copied in said information respondent believes is a true copy.

"Answering the 8th paragraph of said information, respondent says he admits the facts therein alleged, except as in this answer otherwise averred, but denies the conclusions of law and facts therein stated.

"Respondent further avers that his father for forty-two years last past has enjoyed and exercised all of the rights, immunities and privileges and discharged all the duties of a citizen of the United States and of the State of Ohio and was in all respects and to all intents and purposes a citizen of the United States and of the State of Ohio, at all times disclaiming and abjuring allegiance to every foreign prince, potentate, state or sovereignty; that during all of said times said Joseph Boyd behaved as a man of good moral character, attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same; that when the said Joseph Boyd settled in the State of Ohio as aforesaid it was his *bona fide* intention to make the United States his permanent residence; that at that time he did in fact disclaim and abjure all allegiance and fidelity to the Queen of Great Britain and Ireland and to every other foreign prince, potentate, state and sovereignty, and for about 40 years acted

in the belief that he was a citizen of the United States, at all said times exercising the elective franchise without question or challenge, voting for all officers of the State and Federal governments the same as a native-born citizen of the United States and of the State of Ohio.

"Respondent further says that about the year 1870 said Joseph Boyd was elected to the office of justice of the peace in said Muskingum County, Ohio, and thereupon took an oath to support the Constitutions of the United States and of the State of Ohio, and for several years held said office, exercising all the rights, franchises, powers and duties of said office, and has for years last past held office under the constitution and laws of Ohio, to wit, weighmaster in the city of Zanesville, which office he now holds.

"Respondent further says that he was informed by his father as early as the year 1855 that he, the said Joseph Boyd, was a citizen of the United States and entitled, in law and in fact, to all the rights, privileges and immunities of a citizen of the United States and of the State of Ohio, and that ever since said time this respondent has so believed and accepted the fact so to be, and never heard the fact challenged or questioned till after he was elected to the office of governor of this State, in 1890. Respondent further says that he did, upon arriving at the age of 21 years, exercise the elective franchise in said Muskingum County, Ohio, in the fall of 1855.

"The respondent further alleges, on information and belief, that prior to October, 1854, his father did in fact complete his naturalization in strict accordance with the acts of Congress known as the naturalization laws so as to admit and constitute him a full citizen of the United States thereunder, he having exercised the rights of citizenship herein described, and at said time informed respondent that such was the fact; that when his father applied to be registered in Ohio in October, 1890, under a new law, he was required to produce his citizenship papers, and being unable to find all thereof, he appeared before said court of common pleas of Muskingum County, at the October term thereof, 1890, and the proceedings described in the 9th paragraph of the information were had as therein set

out, but respondent avers the fact to be, on information and belief, that in the matter of said proceedings said Joseph Boyd acted inadvisedly and ignorantly, the said last named proceedings being in that event unnecessary.

"Respondent further says that in the year 1856, at the age of 22, he left his father's home in Ohio in the firm belief that he, respondent, was a citizen of the United States in law and in fact, to establish himself in life; that he went to the State of Iowa, where he resided for a few months.

"In the month of August, 1856, respondent removed to the Territory of Nebraska, which was then to a large extent a wilderness, and settled in Douglas County, where he resided for two years, working at his trade as a carpenter, and in 1857 he was elected county clerk of said county, and took an oath to support the Constitution of the United States and the provisions of the organic act under which the Territory of Nebraska was created. Respondent removed to what is now Buffalo County, near old Fort Kearney, which was then upon the extreme frontier, in the fall of 1858, where he engaged in the business of farming, in the midst of great perils from hostile Indians, suffering years of extreme hardship. In 1864, at the time of the Indian outbreak in said vicinity, when the lives and property of settlers were destroyed or endangered, when many settlers were massacred, when hostile Indians killed cattle before the door of the home of his family, he volunteered his services as a soldier of the United States, which were accepted by the United States government, he being sworn into its military service by order of General R. B. Mitchell; that he served as a soldier of the United States, without compensation or reward, to protect the men, women and children of the frontier and to maintain the authority, honor and flag of the United States government.

"In the year 1866 respondent was elected a member of the house of representatives of Nebraska to represent the counties of Buffalo and Hall; that he served as such officer in the following session of the legislature, to which was submitted the proposition of the Congress of the United States to accept the first constitution of this State with the conditions imposed

by the act of Congress known as the enabling act, below named; that before entering upon the duties of said office he took the oath required by law and swore to support the Constitution of the United States and the provisions of the organic act under which the Territory of Nebraska was created.

"In 1868 respondent removed to Douglas County, where he has since resided. In the year 1871 respondent was elected by the electors of said county a member of the convention of the people of the State of Nebraska to form a state constitution, and, after taking the oath required by law to support the Constitutions of the United States and State of Nebraska, in fact served as a member of said convention.

"In the year 1875 the respondent was elected by the electors of said county a member of the convention of the people of the State of Nebraska to form a constitution, which convention discharged that duty in the year 1875, which resulted in forming the constitution under which the government of this State has since existed. Respondent, after taking the oath required by law to support the Constitutions of the United States and of this State, in fact served as a member of said convention.

"In 1880 respondent was elected and acted as president of the city council of the city of Omaha.

"In 1881 respondent was elected mayor of the city of Omaha, and served in said office for two years. In 1885 respondent was again elected to said office of mayor, and served for two years, and before taking the office of mayor each of said times respondent took an oath to support the Constitutions of the United States and of the State of Nebraska.

"Respondent further says that during said period of over 30 years he has exercised the elective franchise in said Territory and State of Nebraska and enjoyed all the rights, privileges and immunities of a citizen of the United States and of said Territory and State.

"Respondent further says that for over 32 years last past he has been in fact and in law a citizen of the United States and of said Territory and State; that neither the United States nor the Territory or State of Nebraska has ever challenged his

citizenship or sought to oust him of the franchise actually enjoyed and exercised by him to be a citizen of the United States, and that it is not competent for this relator so to do; that if his said right and privilege of being a citizen of the United States is subject to challenge, it is solely for the United States in its sovereign capacity to challenge the same.

"And he further avers that he was at the time of the election in question and for more than two years prior thereto eligible to be elected to and to hold said office of governor for the term in question.

"Respondent further says that in 1849 it was his *bona fide* intention to be a citizen of the United States, and that he then renounced and abjured forever all allegiance and fidelity to every foreign prince, potentate, state or sovereignty whatever, and particularly the Queen of Great Britain and Ireland; that during all the time since he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the same, and all said time has absolutely renounced and abjured all allegiance and fidelity to every foreign prince, potentate, state or sovereignty, and particularly the Queen of Great Britain and Ireland.

"Further answering, respondent shows to the court that after his said election as governor and after he had learned for the first time that his citizenship had been questioned, and on December 16th, 1890, he went before the District Court of the United States for the District of Nebraska for the purpose of removing all doubts that might arise thereafter in respect thereof, and by petition to said court represented to that court the facts necessary to be known in that behalf touching his said history and citizenship of the United States, insisting therein that he was and had been for more than two years next preceding his election to the office of governor in November, 1890, a citizen of the United States, and also representing to said court that a question had been raised as to his citizenship; whereupon said court, by its judgment, found, determined and adjudged that he was in fact and law a full citizen of the United States; and respondent avers that he is

and for many years last past has been a citizen of the United States within the meaning and requirements of the acts of Congress of the United States, a copy of which petition, judgment and record is hereto attached and made part of this answer.

"Respondent denies the allegations of the 9th, 10th and 11th paragraphs of said information; except that he refuses to surrender said office of governor to the said relator, and all other allegations of said information not hereinbefore admitted or specially answered.

"Wherefore respondent prays to be hence dismissed with his costs in this behalf most wrongfully expended, and for such other and further relief as may be just and proper.".

Attached to the answer was a duly certified copy of the proceedings of the United States District Court therein referred to.

To this answer the relator demurred, and assigned as grounds of demurrer that the answer did not state facts sufficient to constitute a defence; that the facts stated were insufficient to justify the respondent in holding and exercising the office of governor; that the answer showed on its face that the respondent was an alien and ineligible to the office of governor of Nebraska in November, 1890, at the time of his pretended election; that the answer admitted the facts pleaded in the information, showing the right of the relator to hold the office of governor; that the exhibits filed by the respondent showed him not to have been a citizen of the United States prior to December, 1890; wherefore relator prayed judgment of the court upon the pleadings that the respondent be ousted from said office of governor of Nebraska, and that relator be reinstated therein.

On the 12th of March, 1891, the cause was heard upon the demurrer, and on the 5th of May of that year the court announced its opinion, (two of the three judges concurring and one dissenting,) and entered judgment of ouster as against respondent and reinstating the relator in said office. On the same day a writ was issued in accordance with said judgment, and the relator put into possession of said office in place

of the respondent. The opinions will be found reported, in advance of the official series, in 48 N. W. Rep. 739. A writ of error was thereupon sued out from this court.

*Mr. James C. Cowin, Mr. Henry D. Estabrook* and *Mr. A. H. Garland* for plaintiff in error.

*Mr. John F. Dillon* and *Mr. John L. Webster* (with whom was *Mr. Joseph H. Blair* on the brief) for defendant in error.

James E. Boyd, the plaintiff in error, had not been for two years next preceding his election a citizen of the United States, and hence under the Constitution of the State he was not eligible to the office of governor. He was not a citizen of the United States even at the date of the election. He was fifty-six years of age at the date of the naturalization of his father. Personally, he never made any application to be naturalized as a citizen of the United States until the 16th day of December, 1890, which was after the date of the election at which a plurality of votes was cast for him for the office of governor of the State of Nebraska.

I. He cannot claim to have become a citizen of the United States under the provisions of Section 2172 of the Revised Statutes of the United States, for the reason that he was not under twenty-one years of age at the date of the naturalization of his father. To bring him within the provisions of that section (which is the act of April 14, 1802) he must have been "under the age of twenty-one years at the time of the naturalization of his father." *Campbell* v. *Gordon,* 6 Cranch, 176; *Gumm* v. *Hubbard,* 97 Missouri, 311; *State* v. *Penney,* 10 Arkansas, 621; *O'Connor* v. *The State,* 9 Florida, 215; *United States* v. *Kellar,* 13 Fed. Rep. 82.

II. The facts pleaded in the answer to the effect that James E. Boyd had exercised the elective franchise in Nebraska for a great many years and that he had held office as a member of the legislature, as a member of the constitutional convention and as mayor of the city of Omaha did not make him a citizen of the United States.

. It may be true that James E. Boyd believed himself during all those years to have been a citizen of the United States, but that is immaterial. Aliens can only become American citizens through the process of naturalization. It will not do to permit the argument to prevail, that he should be adjudged to be a citizen of the United States, simply because the people of Nebraska, through ignorance of his alienage, permitted him to vote and hold office.

The case of *Dryden* v. *Swinburne*, 20 West Va. 89, is on all fours with this case. In that case section 2172 of the Revised Statutes was construed, and it was held that a naturalization order cannot be made retroactive; that naturalization cannot be presumed from taking a conveyance of land, voting and exercising other rights of citizenship; that an order admitting to citizenship rebuts the presumption of any previous naturalization; that parol evidence was not competent to prove the fact of naturalization; that section 2172, Rev. Stat. was but the act of 1802 continued in force, and that it was not the purpose of Congress by that section to modify or change the law as expressed in the old statute; and that the word " now " as used in the Revised Statutes has reference to the year 1802, when these provisions first became law.

This question has been twice before the legislative department of the government.

Albert Gallatin was born in Switzerland in 1761, and came to the United States in 1780. In the year 1783 he went to Virginia, and in the month of October, 1785, he took the oath of allegiance in that State. In December, 1785, he removed to Pennsylvania, where he purchased land and became a permanent resident. He was elected in 1789 a member of the convention which was called to amend the constitution of the State of Pennsylvania, and subsequently he was for three successive years elected a member of the Pennsylvania legislature. In February, 1793, he was elected a senator from Pennsylvania, and he came to the Senate and took his seat in the December following.

It appears that from the time he took his oath of allegiance in Virginia, in 1785, to the period of his election as senator,

in 1793, he had not been a citizen of the United States for the time required by the Constitution, which is nine years.

The committee appointed to investigate the case made their report to the Senate, setting forth the foregoing fact. Upon the coming in of the report of the committee, a resolution was offered in these words:

"*Resolved*, That Albert Gallatin, returned to this House as a member from the State of Pennsylvania, is duly qualified for and elected to a seat in the Senate of the United States." This resolution was rejected by a vote of fourteen nays to twelve yeas. The record then proceeds as follows:

"A resolution was then offered in these words:

"*Resolved*, That the *election* of Albert Gallatin to be a senator of the United States was *void*, he not having been a citizen of the United States the term of years required as a qualification to be a senator of the United States.

"A motion was made to divide the question at the word *void;* and

"On motion to agree to the first paragraph on the motion so divided, it passed in the affirmative: Yeas 14, nays 12.

"On motion to adopt the resolution, as follows:

"*Resolved*, That the *election* of Albert Gallatin to be a senator of the United States *was void*, he not having been a citizen of the United States the term of years required as a qualification to be a senator of the United States.

"The vote was: ayes 14, noes 12; and so the resolution was carried."

General Shields was elected a United States senator from the State of Illinois on the 13th day of January, 1849. He was an alien by birth. He was naturalized in the Circuit Court of Effingham County on the 21st of October, 1840. He took his seat as United States senator on the 4th of March, 1849, when his seat was contested upon the ground that he had not been a citizen of the United States the term of nine years required as a qualification to be a senator of the United States. He had resided in the State of Illinois seventeen years. He had held a number of public offices. He had been a member of the legislature, which required naturalization.

He had held the office of Auditor of Public Accounts, which
required naturalization. He had been a Judge of the Supreme
Court of Illinois, which required naturalization. He had been
Commissioner of the General Land Office. He had been a
General in the United States army, and lastly had been elected
United States senator.

The question of his eligibility was referred to a committee
which, on the 13th of March, 1849, reported, and the Senate,
after a short discussion, resolved "that the election of James
Shields to be a senator of the United States was void, he not
having been a citizen of the United States the term of years
required as a qualification to be a senator of the United States
at the commencement of the term for which he was elected."

III. The fact that Boyd was an inhabitant of the Terri-
tory of Nebraska at the time when Nebraska was admitted
into the Union as a State did not have the effect of making
him (he then being an alien) a citizen of the United States.

The question for consideration is whether the admission of
Nebraska as a State into the Union, on an equal footing with
the original States, as provided in the enabling act and the act
of 1867, made all inhabitants thereof including aliens *ipso
facto* citizens of the United States.

Similar or the same language is found in the enabling acts
by which the various Territories were authorized to form state
governments in order to be admitted into the Union of States.

It will be observed by an examination of the enabling act
of Nebraska, as also of various other enabling acts, that it con-
tains no provision touching the rights, privileges and immuni-
ties of the inhabitants, upon the State coming into the Union.
The silence of the enabling acts on this subject is here very
important. The inhabitants of these Territories were living
within the jurisdiction of the United States, were subject to
the jurisdiction of the United States, and were already citi-
zens of the United States except such as were aliens. Those
inhabitants who were citizens of the United States were none
the less citizens by reason of the fact that they were inhabi-
tants of the Territories.

Citizens of the United States do not lose their citizenship by

changing their residence from a State to a Territory. Citizens of the United States residing in the District of Columbia and in the Territories are such citizens to the same extent that they would be if residing in one of the States. *Prentiss* v. *Brennan,* 2 Blatchford, 162; *Pecquet* v. *Swan,* 5 Mason, 35.

It would not be unfair to state that about as large a relative proportion of the inhabitants of the Territory were citizens of the United States as of the inhabitants of any of the States of the Union. There was no occasion, therefore, for Congress to intend the admission of the State into the Union as an act of collective naturalization. There was no more urgency or necessity for such a collective act of naturalization for this Territory than there would be to pass a collective act of naturalization for aliens residing within a State. If Congress had ever intended the admission of States into the Union formed under the various enabling acts to operate as a naturalization of all aliens residing therein, it would doubtless have been so provided in the act itself, in unmistakable terms.

The language of the enabling act has no reference to the status of the inhabitants of the original States when they came into the Union, any more than it can be said to have reference to the footing or relative rights of the original States at the time when they formed the Union of States. Indeed, it is self-evident that no Territory can now be admitted into the Union as a State with all the rights and privileges which were possessed by the original States when they came into the Union.

The view which we have expressed to the effect that the inhabitants of the Territory did not become citizens of the United States by the admission of such Territory as a State into the Union, is expressly held to be sound in *The State* v. *Primrose,* 3 Alabama, 546. This case is referred to in the opinion of the Supreme Court of Nebraska. We are aware of two earlier cases in Louisiana which seem to announce a contrary view, but we cannot accept them as applicable as the circumstances and legislative provisions were essentially different.

The third section of the Treaty of Paris of 1803 speaks solely of the "inhabitants" of the ceded Territory. It says

the "'inhabitants' shall be incorporated, . . . .and ad-
mitted as soon as possible  .  .  .  .  to the enjoyment of all
the rights, advantages and immunities of citizens of the United
States, and in the meantime," etc.   Neither the circumstances
nor the language make the case analogous or similar to the
Nebraska case.

The Nebraska enabling act empowers only the inhabitants
who are qualified voters, free, white male inhabitants above
the age of twenty-one years, who are already citizens of the
United States, or have declared their intention to become
such, to prepare a constitution ; and provides that this consti-
tution shall be preliminary to the admission of the State into
the Union, not preliminary to the admission of the inhabitants
to citizenship of the United States.

The closing paragraph of section 5 of the enabling act, re-
ferring to the former language of the same section, which
relates to the adoption or rejection of the constitution by the
qualified voters, which closing paragraph assumes that the
constitution has been adopted, says : " Whereupon it shall be
the duty of the President of the United States to issue his
proclamation declaring the State admitted into the Union on
an equal footing with the original States ; " *i. e.* the new State
from that time stands in line with every other State in the
Union, with all the privileges and under all the burdens of a
state government.   No mention is made of the inhabitants ;
no statement is made that the inhabitants are admitted to citi-
zenship as in the treaty of Paris.   No foreigners or aliens are
adopted, nor are any made citizens of the United States.

All the inhabitants of the Territory who were aliens when
the same was made a State remained aliens, and no privileges
were accorded them which they would not have enjoyed before
had they removed from the Territory to a State already ad-
mitted.   The distinction made in the constitution and the
legislation of that State between citizens and aliens is at war
with the suggestion that all the inhabitants of Nebraska were
citizens of Nebraska and made *ipso facto* citizens of the United
States by the admission of the State into the Union.   How
can such legislation be harmonized with the argument that all

inhabitants were citizens? If all inhabitants were citizens, why was there a provision in the Constitution and in the statutes providing that aliens should file their declaration of intention to become citizens of the United States before they were entitled either to vote or to hold office? To say that the aliens inhabiting the Territory when the State was admitted into the Union were thereby made citizens of the United States is in conflict with the political history of this country from the time the first State was admitted into the Union down to the present day.

The Organic Act, the enabling act, the act admitting the State, are each and all simple legislative exertions of the powers of Congress, and in no correct sense treaties or the exercise of the treaty-making power. For the reasons hereinbefore stated we submit in conclusion of this part of the discussion, that there is no analogy between the case of the acquisition by treaty of foreign territory and the status of the inhabitants. of the Territory so acquired and the case of the national ownership of the public domain and the status of the people residing therein with the consent of the national government, which first erects a territorial government and subsequently makes provision to admit the Territory thus erected as a State of the Union.

Mr. Chief Justice Fuller delivered the opinion of the court.

(1) In *State of Nebraska ex rel. Glenn* v. *Stein*, 13 Nebraska, 529, it was held that where the State at large was interested in a proceeding in *quo warranto*, the attorney general was, as at common law, the proper person to institute it, but when the information was filed by an individual to oust the incumbent from an office and install the relator therein, it was a personal remedy on behalf of the individual claiming to be aggrieved, and the State was but a nominal party.

In the case at bar the attorney general refused to file the information, and the relator obtained leave to prosecute it in the name of the State, but on his own behalf, as under the statute he was authorized to do. Compiled Stat. Neb. 1891; c. 71, p. 626; Code Civ. Proced. Tit. 23, p. 954.

By section 2 of article V of the constitution of the State of Nebraska, in force November 1, 1875, it was provided: "No person shall be eligible to the office of governor, or lieutenant governor, who shall not have attained the age of thirty years, and been for two years next preceding his election a citizen of the United States and of this State.   None of the officers of the executive department shall be eligible to any other State office during the period for which they have been elected." Comp. Stat. Neb. 1891, p. 26.

In *United States* v. *Cruikshank*, 92 U. S. 542, 549, Mr. Chief Justice Waite, delivering the opinion of the court, said: "Citizens are the members of the political community to which they belong.   They are the people who compose the community, and who, in their associated capacity, have established or submitted themselves to the dominion of a government for the promotion of their general welfare and the protection of their individual as well as their collective rights."   There is no attempt in this definition, which was entirely sufficient for the argument, to exclude those members of the State who are citizens in the sense of participation in civil rights, though not in the exercise of political functions.

The Constitution provides that no person shall be a representative who has not been "seven years a citizen of the United States," (Art. I, sec. 2, par. 2;) that no person shall be a senator who has not been "nine years a citizen of the United States," (Art. I, sec. 3, par. 3;) that no person shall be eligible to the office of President of the United States "except a natural-born citizen, or a citizen of the United States, at the time of the adoption of this Constitution," (Art. II, sec. 1, par. 4;) and that "the citizens of each State shall be entitled to all privileges and immunities of citizens in the several States," (Art. IV, sec. 2, par. 1.)   And Congress is empowered "to establish an uniform rule of naturalization," (Art. I, sec. 8, par. 4.)   But prior to the adoption of the Fourteenth Amendment there was no definition of citizenship of the United States in the instrument.

Mr. Justice Story, in his Commentaries on the Constitution, says: "Every citizen of a State is *ipso facto* a citizen of the

United States." (Sec. 1693.) And this is the view expressed by Mr. Rawle in his work on the Constitution. (c. 9, pp. 85, 86.) Mr. Justice Curtis, in *Dred Scott* v. *Sandford*, 19 How. 393, 576, expressed the opinion that under the Constitution of the United States "every free person born on the soil of a State, who is a citizen of that State by force of its constitution or laws, is also a citizen of the United States." And Mr. Justice Swayne, in *The Slaughter-House Cases*, 16 Wall. 36, 126, declared that "a citizen of a State is *ipso facto* a citizen of the United States." But in *Dred Scott* v. *Sandford*, 19 How. 393, 404, Mr. Chief Justice Taney, delivering the opinion of the court, said: "The words 'people of the United States' and 'citizens' are synonymous terms, and mean the same thing. They both describe the political body who, according to our republican institutions, form the sovereignty, and who hold the power and conduct the government through their representatives. They are what we familiarly call the 'sovereign people' and every citizen is one of this people, and a constituent member of this sovereignty. . . . In discussing this question, we must not confound the rights of citizenship which a State may confer within its own limits, and the rights of citizenship as a member of the Union. It does not by any means follow, because he has all the rights and privileges of a citizen of a State, that he must be a citizen of the United States. He may have all of the rights and privileges of the citizen of a State, and yet not be entitled to the rights and privileges of a citizen in any other State. For, previous to the adoption of the Constitution of the United States, every State had the undoubted right to confer on whomsoever it pleased the character of citizen, and to endow him with all its rights. But this character of course was confined to the boundaries of the State, and gave him no rights or privileges in other States beyond those secured to him by the laws of nations and the comity of States. Nor have the several States surrendered the power of conferring these rights and privileges by adopting the Constitution of the United States. Each State may still confer them upon an alien, or any one it thinks proper, or upon any class or description of persons; yet he would not be a citizen in the sense in

which that word is used in the Constitution of the United States, nor entitled to sue as such in one of its courts, nor to the privileges and immunities of a citizen in the other States. The rights which he would acquire would be restricted to the State which gave them. The Constitution has conferred on Congress the right to establish an uniform rule of naturalization, and this right is evidently exclusive, and has always been held by this court to be so. Consequently, no State, since the adoption of the Constitution, can by naturalizing an alien invest him with the rights and privileges secured to a citizen of a State under the Federal government, although, so far as the State alone was concerned, he would undoubtedly be entitled to the rights of a citizen, and clothed with all the rights and immunities which the constitution and laws of the State attached to that character."

The Fourteenth Amendment reads: "All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

In *The Slaughter-House Cases*, 16 Wall. 36, it was held by this court that the first clause of the fourteenth article was primarily intended to confer citizenship on the negro race, and secondly to give definitions of citizenship of the United States, and citizenship of the States, and it recognized the distinction between citizenship of a State and citizenship of the United States by those definitions; that the privileges and immunities of citizens of the States embrace generally those fundamental civil rights for the security and establishment of which organized society was instituted, and which remain, with certain exceptions mentioned in the Federal Constitution, under the care of the State governments; while the privileges and immunities of citizens of the United States are those which arise out of the nature and essential character of the national

government, the provisions of its Constitution, or its laws and treaties made in pursuance thereof; and that it is the latter which are placed under the protection of Congress by the second clause of the Fourteenth Amendment.

In *Gassies* v. *Ballon*, 6 Pet. 761, 762, Mr. Chief Justice Marshall declared that "a citizen of the United States, residing in any State of the Union, is a citizen of that State;" and the Fourteenth Amendment embodies that view.

The Supreme Court of Nebraska decided that James E. Boyd had not been for two years next preceding his election a citizen of the United States, and hence that under the constitution of the State he was not eligible to the office of governor; and that he was not a citizen of the United States, because during his entire residence in the Territory from 1856 to 1867, and in the State from 1867 to November 4, 1890, the date upon which he was elected governor, he was a subject of Great Britain and Ireland.

Arrival at this conclusion involved the denial of a right or privilege under the Constitution and laws of the United States, upon which the determination of whether Boyd was a citizen of the United States or not depended, and jurisdiction to review a decision against such right or privilege necessarily exists in this tribunal. *Missouri* v. *Andriano*, 138 U. S. 496. Each State has the power to prescribe the qualifications of its officers and the manner in which they shall be chosen, and the title to offices shall be tried, whether in the judicial courts or otherwise. But when the trial is in the courts, it is "a case," and if a defence is interposed under the Constitution or laws of the United States, and is overruled, then, as in any other case decided by the highest court of the State, this court has jurisdiction by writ of error.

We do not understand the contention to involve, directly, a denial of the right of expatriation, which the political departments of this government have always united in asserting, (Lawrence's Wheaton, 925; Whart. Confl. Laws, § 5; 8 Op. Att'y Gen. 139; 9 Op. Att'y Gen. 356; Act of Congress of July 27, 1868, 15 Stat. 223, c. 249.; Rev. Stat. § 1999,) but that it is insisted that Boyd was an alien upon the ground that the

disabilities of alienage had never been removed, because he had never been naturalized.

Naturalization is the act of adopting a foreigner, and clothing him with the privileges of a native citizen, and relator's position is that such adoption has neither been sought nor obtained by respondent under the acts of Congress in that behalf.

Congress in the exercise of the power to establish an uniform rule of naturalization has enacted general laws under which individuals may be naturalized, but the instances of collective naturalization by treaty or by statute are numerous.

Thus, although Indians are not members of the political sovereignty, many classes of them have been made citizens in that way. *Elk* v. *Wilkins,* 112 U. S. 94. By the treaty of September 27, 1830, provision was made for such heads of families of the Choctaws as desired it, to remain and become citizens of the United States. 7 Stat. 335. By the treaty of December 29, 1835, such individuals and families of the Cherokees as were averse to a removal west of the Mississippi and desirous to become citizens of the States where they resided were allowed to do so. Ibid. 483. By the act of Congress of March 3, 1843, it was provided that on the completion of certain arrangements for the partition of the lands of the tribe among its members, "the said Stockbridge tribe of Indians, and each and every of them, shall then be deemed to be, and from that time forth are hereby declared to be, citizens of the United States, to all intents and purposes, and shall be entitled to all the rights, privileges and immunities of such citizens." 5 Stat. 47, c. 101, § 7. And such was the act of March 3, 1839, 5 Stat. c. 83, pp. 349, 351, relating to the Brothertown Indians of Wisconsin.

The act of Congress approved February 8, 1887, 24 Stat. 388, c. 119, was much broader, and by its terms made every Indian situated as therein referred to, a citizen of the United States.

Manifestly the nationality of the inhabitants of territory acquired by conquest or cession becomes that of the government under whose dominion they pass, subject to the right of election on their part to retain their former nationality by removal or otherwise. as may be provided.

All white persons or persons of European descent who were born in any of the colonies, or resided or had been adopted there, before 1776, and had adhered to the cause of independence up to July 4, 1776, were by the declaration invested with the privileges of citizenship. *United States* v. *Ritchie,* 17 How. 525, 239 ; *Inglis* v. *Trustees of Sailors' Snug Harbor,* 3 Pet. 99. In *McIlvaine* v. *Coxe's Lessee,* 4 Cranch, 209, it was held that Mr. Coxe had lost the right of election by remaining in New Jersey after she had declared herself a State, and had passed laws pronouncing him to be a member of the new government; but the right itself was not denied. *Shanks* v. *Dupont,* 3 Pet. 242.

Under the second article of Jay's treaty (8 Stat. 116, 117), British subjects who resided at Detroit before and at the time of the evacuation of the Territory of Michigan, and who continued to reside there afterwards without at any time prior to the expiration of one year from such evacuation declaring their intention of becoming British subjects, became *ipso facto* to all intents and purposes American citizens. *Crane* v. *Reeder,* 25 Michigan, 303.

By section three of Article IV of the Constitution, "new States may be admitted by the Congress into this Union." The section, as originally reported by the committee of detail, contained the language: "If the admission be consented to, the new State shall be admitted on the same terms as the original ones. But the legislature may make conditions with the new States concerning the public debt which shall be then subsisting." These clauses were stricken out, in spite of strenuous opposition, upon the view that wide latitude ought to be given to the Congress, and the denial of any attempt to impede the growth of the western country. Madison Papers, 5 Elliot, 381, 492, 493 ; 3 Gilpin, 1456.

And paragraph two was added, that "the Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States ; and nothing in this Constitution shall be so construed as to prejudice any claims of the United States, or of any particular State."

By article three of the treaty of Paris of 1803, (8 Stat. 200, 202,) it was provided that "the inhabitants of the ceded territory shall be incorporated in the Union of the United States, and admitted as soon as possible, according to the principles of the Federal Constitution, to the enjoyment of all the rights, advantages and immunities of citizens of the United States; and in the meantime they shall be maintained and protected in the free enjoyment of their liberty, property and the religion which they profess."

It was said by Mr. Justice Catron, in his separate opinion in *Dred Scott* v. *Sandford*, 19 How. 393, 525: "The settled doctrine in the state courts of Louisiana is, that a French subject coming to the Orleans territory, after the treaty of 1803 was made, and before Louisiana was admitted into the Union, and being an inhabitant at the time of the admission, became a citizen of the United States by that act; that he was one of the inhabitants contemplated by the third article of the treaty, which referred to all the inhabitants embraced within the new State on its admission. That this is the true construction I have no doubt."

In *Desbois's Case*, 2 Martin, 185, (decided in 1812,) one Desbois, of French birth, applied for a license to practise as a counsellor and attorney at law in the Superior Courts of Louisiana, and by one of the rules of the court the applicant could not be admitted unless he was a citizen of the United States. Desbois conceded that he had no claim to citizenship by birth nor by naturalization under the acts of Congress to establish an uniform rule on that subject, but he contended that there was a third mode of acquiring citizenship of the United States, namely, the admission into the Union of a State of which he was a citizen. He contended that as he had, in the year 1806, removed to and settled with his family in the city of New Orleans in the territory of Orleans, in contemplation of the enjoyment of all the advantages which the laws of the territory and of the United States held out to foreigners removing into that territory, and had ever since considered it as his adopted country, he had become a citizen under the act of Congress of March 2, 1805, further providing for the territorial government

of Orleans, the enabling act of February 20, 1811, and that
of April 8, 1812, admitting the State.

Judge Martin, who delivered the opinion of the court,
referred among other things to the fact that the act of Con-
gress authorizing the formation of the state government of
Louisiana was almost literally copied from that which author-
ized that of Ohio, and, pointing out that by the first section
of the latter statute the inhabitants of the designated territory
were authorized to form for themselves a state constitution,
while by the fourth section the persons entitled to vote for
members of the convention were described as, first, all male
citizens of the United States, and next, all other persons hav-
ing in all other respects the legal qualifications to vote for
members of the general assembly of the territory, which were
a freehold of fifty acres of land in the district and citizenship
of one of the States and residence in the district, or the like
freehold and two years' residence in the district, said " The
word inhabitants, in the first section of this act, must be taken
*lato sensu;* it cannot be restrained so as to include citizens of
the United States only; for other persons are afterwards called
upon to vote.   There is not any treaty, or other instrument,
which may be said to control it.   Every attempt to restrict it
must proceed on principles absolutely arbitrary.   If the word
is to be taken *lato sensu* in the act passed in favor of the peo-
ple of one Territory, is there any reason to say that we are to
restrain it, in another act, passed for similar purposes, in favor
of the people of another Territory?" pp. 192, 193.

And after an able discussion of the subject, he concluded
that the applicant must be considered a citizen of the State of
Louisiana, and entitled to all the rights and privileges of a
citizen of the United States.

In 1813, in *United States* v. *Laverty,* 3 Martin, 733, Judge
Hall of the District Court of the United States held that the
inhabitants of the territory of Orleans became citizens of Lou-
isiana and of the United States by the admission of Louisiana
into the Union; denied that the only constitutional mode of
becoming a citizen of the United States is naturalization by
compliance with the uniform rule established by Congress;

and fully agreed with the decision in Desbois's case, which he cited.

By the ordinance for the government of the Northwest Territory, of July 13, 1787, it was provided that as soon as there should be 5000 free male inhabitants of full age in the district thereby constituted, they were to receive authority to elect representatives to a general assembly, and the qualifications of a representative in such cases were previous citizenship of one of the United States for three years and residence in the district, or a residence of three years in the district and a fee simple estate of 200 acres of land therein. The qualifications of electors were a freehold in fifty acres of land in the district, previous citizenship of one of the United States, and residence, or the like freehold, and two years' residence in the district. And it was also provided that there should be formed in the territory not less than three nor more than five States, with certain boundaries, and that whenever any such State should contain 60,000 free inhabitants, such State should be admitted by its delegates in Congress on an equal footing with the original States in all respects whatever, and should be at liberty to form a permanent constitution and state government, provided it should be republican and in conformity with the articles of compact. 1 Stat. 51*a*; Rev. Stat. 2d. ed. Organic Laws, 13, 14.

Reference to the various acts of Congress creating the Indiana and Illinois territories, 2 Stat. 58, c. 41; 2 Stat. 514, c. 13; the enabling acts under which the state governments of Ohio, Indiana and Illinois were formed, 2 Stat. 173, c. 40; 3 Stat. 289, c. 57; 2 Stat. 428, c. 67; and the act recognizing, and resolutions admitting, those States, 2 Stat. 201, c. 7; 3 Stat. 399; 3 Stat. 536; and to their original constitutions; establishes that the inhabitants or people who were empowered to take part in the creation of these new political organisms, and who continued to participate in the discharge of political functions, included others than those who were originally citizens of the United States. And that the action of Congress was advisedly taken is put beyond doubt by the language used in the legislation in question.

In the case of the admission of Michigan this was strikingly

shown. By the act of Congress of January 11, 1805, 2 Stat. 309, c. 5, a part of the Indiana Territory was constituted the Territory of Michigan, and a government in all respects similar to that provided by the ordinance of 1787 was established. The act of February 16, 1819, 3 Stat. 482, c. 22, authorized that Territory to send a delegate to Congress, and conferred the right of suffrage on the free white male citizens of the Territory who had resided therein one year next preceding the election and had paid county or territorial taxes. The act of March 3, 1823, 3 Stat. 769, c. 36, provided that all citizens of the United States having the qualifications prescribed by the act of February 16, 1819, should be entitled to vote and be eligible to office. By an act of the territorial legislature of January 26, 1835, the free white male inhabitants of the Territory of full age, who had resided therein three months preceding "the fourth day of April next in the year one thousand eight hundred and thirty-five," were authorized to choose delegates to form a constitution and state government. Mich. Laws, 1835, pp. 72, 75. Delegates were elected accordingly, and a constitution completed June 29, 1835, and ratified by a vote of the people November 2, 1835, which provided that every white male citizen above the age of twenty-one years, who had resided in the State six months next preceding any election, should be entitled to vote at any election, "and every white male inhabitant of the age aforesaid, who may be a resident of the State at the time of the signing of this constitution, shall have the right of voting as aforesaid." 1 Charters and Constitutions, 983, 984. This constitution was laid before Congress by President Jackson in a special message, December 9, 1835, and a bill was introduced for the admission of Michigan into the Union. While this was under consideration an amendment to the provision that on the assent being given by a convention of the people of Michigan to certain boundaries defined in the bill, the State should be admitted, to strike out the words "people of the said State" and insert "by the free male white citizens of the United States over the age of twenty-one years, residing within the limits of the proposed State," was voted down; as was also another amendment proposing

to insert after that part of the bill which declared the constitution of the new State ratified and confirmed by Congress, the words "except that provision of said constitution by which aliens are permitted to enjoy the right of suffrage." The act was passed June 15, 1836, and the conditions imposed having been first rejected and then finally accepted, the State was admitted into the Union by the act of January 26, 1837.

In all these instances citizenship of the United States in virtue of the recognition by Congress of the qualified electors of the State as citizens thereof, was apparently conceded, and it was the effect in that regard that furnished a chief argument to those who opposed the admission of Michigan. It may be added as to that State that the state constitution of 1850, as amended in 1870, preserved the rights as an elector of "every male inhabitant, residing in the State on the 24th day of June, 1835." And in *Attorney General* v. *Detroit,* 78 Michigan, 545, 563, the Supreme Court of Michigan assigned as one of the reasons for holding the registry law under consideration invalid, that no provision was therein made for this class of voters, nor for the inhabitants who had resided in Michigan in 1850 and declared their intention to become citizens of the United States, who had the right to vote under the constitution of 1850.

The sixth article of the treaty of 1819 with Spain, 8 Stat. 256, contained a provision to the same effect as that in the treaty of Paris, and Mr. Chief Justice Marshall said (*Amer. Ins. Co.* v. *Canter,* 1 Pet. 511, 542): "This treaty is the law of the land, and admits the inhabitants of Florida to the enjoyment of the privileges, rights, and immunities of the citizens of the United States. It is unnecessary to inquire whether this is not their condition, independent of stipulation. They do not, however, participate in political power; they do not share in the government, till Florida shall become a State. In the meantime, Florida continues to be a Territory of the United States; governed by virtue of that clause in the Constitution, which empowers Congress ' to make all needful rules and regulations, respecting the Territory, or other property belonging to the United States.' "

At the second session of the Twenty-seventh Congress, in the case of David Levy, who had been elected a delegate from the Territory of Florida, where it was alleged that he was not a citizen of the United States, it was held by the House Committee on Elections that "it matters nothing whether the naturalization be effected by act of Congress, by treaty or by the admission of new States, the provision is alike applicable."

The question turned on whether Mr. Levy's father was an inhabitant of Florida at the time of its transfer to the United States, as the son admitted that he was not a native-born citizen of the United States, but claimed citizenship through that of his father effected by the treaty while he was a minor. The argument of the report in support of the position that "no principle has been more repeatedly announced by the judicial tribunals of the country, and more constantly acted upon, than that the leaning, in questions of citizenship, should always be in favor of the claimant of it," and that liberality of interpretation should be applied to such a treaty, is well worthy of perusal. Contested Elections, 1834, 1835, 2d Session, 38th Congress, 41.

By the eighth article of the treaty with Mexico of 1848, those Mexicans who remained in the territory ceded, and who did not declare within one year their intention to remain Mexican citizens, were to be deemed citizens of the United States. 9 Stat. 930.

By the annexation of Texas, under a joint resolution of Congress of March 1, 1845, and its admission into the Union on an equal footing with the original States, December 29, 1845, all the citizens of the former republic became, without any express declaration, citizens of the United States. 5 Stat. 798; 9 Stat. 108; *McKinney* v. *Saviego*, 18 How. 235; *Cryer* v. *Andrews*, 11 Texas, 170; *Barrett* v. *Kelly*, 31 Texas, 476; *Carter* v. *Territory*, 1 N. Mex. 317.

It is too late at this day to question the plenary power of Congress over the Territories. As observed by Mr. Justice Matthews, delivering the opinion of the court in *Murphy* v. *Ramsey*, 114 U. S. 15, 44: "It rests with Congress to say whether, in a given case, any of the people, resident in the

Territory, shall participate in the election of its officers, or·
the making of its laws; and it may, therefore, take from them
any right of suffrage it may previously have conferred, or at
any time modify or abridge it as it may deem expedient. · The
right of local self-government, as known to our system as a
constitutional franchise, belongs, under the Constitution, to the
States and to the people thereof, by whom that Constitution
was ordained, and to whom by its terms all power not con-
ferred by it upon the government of the United States was
expressly reserved. The personal and civil rights of the in-
habitants of the Territories are secured to them, as to other
citizens, by the principles of constitutional liberty which re-
strain all the agencies of government, state and national;
their political rights are franchises which they hold as privi-
leges in the legislative discretion of the Congress of the United
States. . . . If we concede that this discretion in Con-
gress is limited by the obvious purposes for which it was con-
ferred, and that those purposes are satisfied by measures
which prepare the people of the Territories to become States
in the Union, still the conclusion cannot be avoided, that the
act of Congress here in question is clearly within that justifi-
cation."

Congress having the power to deal with the people of the
Territories in view of the future States to be formed from
them, there can be no doubt that in the admission of a State
a collective naturalization may be effected in accordance with
the intention of Congress and the people applying for admis-
sion.

Admission on an equal footing with the original States, in
all respects whatever, involves equality of constitutional right
and power, which cannot thereafterwards be controlled, and
it also involves the adoption as citizens of the United States
of those whom Congress makes members of the political com-
munity, and who are recognized as such in the formation of
the new State with the consent of Congress.

The organic law under which the Territory of Nebraska
was organized, approved May 30, 1854, 10 Stat. 277, c. 59,
provided in its fourth section for a legislative assembly, con-

sisting of a council and a house of representatives, and that the members of the assembly should have the qualification of voters as thereinafter prescribed. Its fifth section was as follows :

"Sec. 5. *And be it further enacted*, That every free white male inhabitant above the age of twenty-one years who shall be an actual resident of said Territory, and shall possess the qualifications hereinafter prescribed, shall be entitled to vote at the first election, and shall be eligible to any office within the said Territory ; but the qualifications of voters, and of holding office, at all subsequent elections, shall be such as shall be prescribed by the legislative assembly ; *Provided*, that the right of suffrage and of holding office shall be exercised only by citizens of the United States and those who shall have declared on oath their intention to become such, and shall have taken an oath to support the Constitution of the United States and the provisions of this act : *And, provided further*, That no officer, soldier, seaman, or marine, or other person in the army or navy of the United States, or attached to troops in the service of the United States, shall be allowed to vote or hold office in said Territory, by reason of being on service therein."

Sections 10, 11 and 12 of chapter 9 of a general code for that Territory entitled "Elections," approved January 26, 1856, read thus:

"Sec. 10. Every free white male citizen of the United States, who has attained the age of twenty-one years, and those who shall have declared on oath their intention to become such, and shall have taken an oath to support the Constitution of the United States, and the provisions of the organic law of this Territory, shall be entitled to vote in the precinct where he resides, at all elections. *Provided*, he has been an inhabitant of this Territory forty days and of the county twenty days next preceding the election.

"Sec. 11. Any member of the board of electors, or persons who have voted at such election, may challenge any elector proposing to vote, whereupon one of the said board shall tender to such elector the following oath : I, A. B, solemnly swear that I am a citizen of the United States, or that I have taken

an oath to become such (as the case may be); that I have been an inhabitant of the county of ——— for the last twenty days, and in this Territory for the last forty days, and have attained the age of twenty-one years to the best of my knowledge and belief.

"Upon taking such oath his ballot shall be received.

"SEC. 12. Any person taking any of the oaths herein contained, knowing them to be false, shall be deemed guilty of perjury." Sess. Laws Neb. 1855–56, pp. 50, 51.

By section 4 of chapter 27, entitled "Officers," Sess. Laws Neb. 1855–56, p. 79, it was enacted : "Neither shall any person be entitled to hold any office of trust or profit in this Territory unless he be a free white male citizen of the United States, and over the age of twenty-one years."

If by this provision it was intended by the territorial legislature to deprive those who had declared their intention of becoming citizens of the right to hold office, we do not regard the attempt to do so as substantially affecting the argument.

By an act respecting elections, approved January 10, 1862, Sess. Laws Neb. 1861–62, p. 92, it was provided that every free white male citizen of the United States, and those who had in accordance with the laws of the United States filed their declaration of intention to become such, and who had attained the age of twenty-one years, should be entitled to vote at any election in this Territory. Punishment was prescribed for persons who should vote when not citizens of the United States, or when they had not declared their intention to become such; and provision was made for challenges on the ground that the person had not made the declaration, provided that no such declaration of intention need be produced where the person stated that by reason of the naturalization of his parents, or one of them, he had become a citizen of the United States, and when or where his parent or parents were naturalized. Similar provisions were contained in an act passed in 1864. Sess. Laws. Neb. 1864, p. 108.

On April 19, 1864, Congress passed an act "to enable the people of Nebraska to form a constitution and state government, and for the admission of such State into the Union on

an equal footing with the original States." 13 Stat. 47, c. 59. The first section was: "That the inhabitants of that portion of the Territory of Nebraska included in the boundaries hereinafter designated, be, and they are hereby, authorized to form for themselves a constitution and state government, with the name aforesaid, which State, when so formed, shall be admitted into the Union as hereinafter provided." The third section read: "That all persons qualified by law to vote for representatives to the general assembly of said Territory shall be qualified to be elected; and they are hereby authorized to vote for and choose representatives to form a convention, under such rules and regulations as the governor of said Territory may prescribe, and also to vote upon the acceptance or rejection of such constitution as may be formed by said convention, under such rules and regulations as said convention may prescribe; and if any of said citizens are enlisted in the army of the United States, and are still within said Territory, they shall be permitted to vote at their place of rendezvous; . . . and the governor of said Territory shall, by proclamation, on or before the first Monday of May next, order an election of the representatives aforesaid to be held on the first Monday in June thereafter throughout the Territory; and such election shall be conducted in the same manner as is prescribed by the laws of said Territory regulating elections therein for members of the house of representatives; and the number of members to said convention shall be the same as now constitute both branches of the legislature of the aforesaid Territory."

Section five provided for the submission of the constitution to the qualified voters of the Territory as thereinbefore designated; and that if a majority of the legal votes were cast for the constitution, the result should be certified to the President, whereupon it should be his duty " to issue his proclamation declaring the State admitted into the Union on an equal footing with the original States, without any further action whatever on the part of Congress."

No action was taken by the convention which was elected under this law, but a constitution was subsequently framed by

the territorial legislature, which completed it February 9, 1866. It was submitted to the people at an election held June 21, 1866, and ratified by a vote of 3938 against 3838.

On the 9th of February, 1867, 14 Stat. 391, an act for the admission of Nebraska into the Union became a law, which recited that whereas, on the 19th of April, 1864, Congress passed an act to enable the people of Nebraska to form a constitution and state government, and offered to admit said State when so formed into the Union upon compliance with certain conditions therein specified; and whereas it appears that said people have adopted a constitution which, upon due examination, is found to conform to the provisions and comply with the conditions of said act, and that they now ask for admission into the Union, therefore, be it enacted, etc., "that the constitution and state government which the people of Nebraska have formed for themselves be, and the same is hereby, accepted, ratified and confirmed; and that the said State of Nebraska shall be, and is hereby declared to be, one of the United States of America, and is hereby admitted into the Union upon an equal footing with the original States in all respects whatsoever." By the second section it was declared that the new State was entitled to all the rights, privileges, grants and immunities and was subject to all the conditions and restrictions of the enabling act. By the third section the fundamental condition was imposed upon the taking effect of the act, that there should be within the State of Nebraska no denial of the elective franchise, or of any other right, to any person, by reason of race or color, excepting Indians not taxed, and the further fundamental condition that the legislature of the State should declare the assent of the State to such conditions, proof of which being transmitted to the President, he by proclamation should announce the fact, and the admission of the State should be accomplished. This third section was accepted and ratified by the legislature of Nebraska on the 20th of February following and declared to be part of the organic law of the State; whereupon, on March 1, 1867, 14 Stat. 820, the President issued his proclamation that "whereas the Congress of the United States did, by an act,

approved on the nineteenth day of April, one thousand eight hundred and sixty-four authorize the people of the Territory of Nebraska to form a constitution and state government, and for the admission of such State into the Union on an equal footing with the original States, upon certain conditions in said act specified; and whereas said people did adopt a constitution conforming to the provisions and conditions of said act, and ask admission into the Union;" etc., therefore the admission of the State into the Union was complete.

This constitution provided, Art. II, §§ 1, 2, (2 Charters and Constitutions, 1205, that the electors should be white citizens of the United States and white persons of foreign birth who had declared their intention to become such, and it was therefore that Congress imposed the condition referred to, which operated to prevent discrimination by reason of color, and may have had a broader effect, which it is not now necessary to consider.

The fourteenth section of the first article, (2 Charters and Constitutions, 1204,) read as follows: "No distinction shall ever be made by law between resident aliens and citizens in reference to the possession, enjoyment or descent of property," and this, it seems to us, taken in connection with the other provisions, was a clear recognition of the distinction between those who had and those who had not elected to become aliens.

It follows from these documents that Congress regarded as citizens of the Territory all who were already citizens of the United States, and all who had declared their intention to become such. Indeed, they are referred to in section three of the enabling act as citizens, and by the organic law the right of suffrage and of holding office had been allowed to them. Those whose naturalization was incomplete were treated as in the same category as those who were already citizens of the United States. What the State had power to do after its admission is not the question. Before Congress let go its hold upon the Territory, it was for Congress to say who were members of the political community. So far as the original States were concerned, all those who were citizens of such States became upon the formation of the Union citizens of the United

States, and upon the admission of Nebraska into the Union "upon an equal footing with the original States, in all respects whatsoever," the citizens of what had been the Territory became citizens of the United States and of the State.

As remarked by Mr. Chief Justice Waite in *Minor* v. *Happersett*, 21 Wall. 162, 167: "Whoever, then, was one of the people of either of these States when the Constitution of the United States was adopted, became *ipso facto* a citizen — a member of the nation created by its adoption. He was one of the persons associating together to form the nation, and was, consequently, one of its original citizens. As to this there has never been a doubt. Disputes have arisen as to whether or not certain persons or certain classes of persons were part of the people at the time, but never as to their citizenship if they were."

But it is argued that James E. Boyd had never declared his intention to become a citizen of the United States, although his father had, and that because, as alleged, his father had not completed his naturalization before the son attained his majority, the latter cannot be held to come within the purview of the acts of Congress relating to the Territory and the admission of the State, so as to be entitled to claim to have been made a citizen thereby.

The act of March 26, 1790, 1 Stat. 103, c. 3, provided for the naturalization of aliens and then that "the children of such persons so naturalized, dwelling within the United States, being under the age of twenty-one years at the time of such naturalization, shall also be considered as citizens of the United States."

The third section of the act of January 29, 1795, 1 Stat. 414, 415, c. 20, provided "that the children of persons duly naturalized, dwelling within the United States, and being under the age of twenty-one years, at the time of such naturalization, and the children of citizens of the United States, born out of the limits and jurisdiction of the United States, shall be considered as citizens of the United States," etc.

The fourth section of the act of April 14, 1802, 2 Stat. 153, 155, c. 28, carried into the Revised Statutes as section 2172,

was: "That the children' of persons duly naturalized under any of the laws of the United States, or who, previous to the passing of any law on that subject, by the government of the United States, may have become citizens of any one of the said States, under the laws thereof, being under the age of twenty-one years, at the time of their parents being so naturalized or admitted to the rights of citizenship, shall, if dwelling in the United States, be considered as citizens of the United States." In *Campbell* v. *Gordon*, 6 Cranch, 176, it was held that this section conferred the rights of citizenship upon the minor child of a parent who had been duly naturalized under the act of 1795, although the child did not become a resident of the United States until she came here after that, but before the act of 1802 was passed.

The rule was to be a uniform rule, and we perceive no reason for limiting such a rule to the children of those who had been already naturalized. In our judgment the intention was that the act of 1802 should have a prospective operation. *United States* v. *Kellar*, 13 Fed. Rep. 82; *West* v. *West*, 8 Paige, 433; *State* v. *Andriano*, 92 Missouri, 70; *State* v. *Penney*, 10 Arkansas, 621; *O'Connor* v. *The State*, 9 Florida, 215.

By the second section of the act of March 26, 1804, 2 Stat. 292, c. 47, p. 293, if any alien who had complied with the terms of the act should die without having completed his naturalization, his widow and children should be considered citizens upon taking the oaths prescribed by law; and this was carried forward into section 2168 of the Revised Statutes.

By the first section of the act of May 26, 1824, 4 Stat. 69, c. 186, carried forward into section 2167 of the Revised Statutes, any alien, being a minor, who shall have resided in the United States three years next preceding his arrival at majority and continued to reside therein, may, upon reaching the age of twenty-one years, and after a residence of five years, including the three years of minority, be admitted a citizen of the United States without having made during minority the declaration of intention required in the case of aliens.

The statutory provisions leave much to be desired, and the attention of Congress has been called to the condition of the

laws in reference to election of nationality; and to the desirability of a clear definition of the status of minor children of fathers who had declared their intention to become citizens, but had failed to perfect their naturalization; and of the status gained by those of full age by the declaration of intention. 2 Whart. Int. Dig. 340, 341, 350.

Clearly minors acquire an inchoate status by the declaration of intention on the part of their parents. If they attain their majority before the parent completes his naturalization, then they have an election to repudiate the status which they find impressed upon them, and determine that they will accept allegiance to some foreign potentate or power rather than hold fast to the citizenship which the act of the parent has initiated for them. Ordinarily this election is determined by application on their own behalf, but it does not follow that an actual equivalent may not be accepted in lieu of a technical compliance.

James E. Boyd was born in Ireland of Irish parents in 1834, and brought to this country in 1844 by his father, Joseph Boyd, who settled at Zanesville, Muskingum County, Ohio, and on March 5, 1849, declared his intention to become a citizen of the United States. In 1855 James E. Boyd, who had grown up in the full belief of his father's citizenship and had been assured by him that he had completed his naturalization by taking out his second papers in 1854, voted in Ohio as a citizen. In August, 1856, he removed to the Territory of Nebraska. In 1857 he was elected and served as county clerk of Douglas County; in 1864 he was sworn into the military service and served as a soldier of the Federal government to defend the frontier from an attack of Indians; in 1866 he was elected a member of the Nebraska legislature and served one session; in 1871 he was elected a member of the convention to frame a state constitution and served as such; in 1875 he was again elected and served as a member of the convention which framed the present state constitution; in 1880 he was elected and acted as president of the city council of Omaha; and in 1881 and 1885, respectively, was elected mayor of that city, serving in all four years. From 1856 until the State was ad-

mitted, and from thence to this election, he had voted at every election, territorial, state, municipal and national. He had taken, prior to the admission of the State, the oath required by law in entering upon the duties of the offices he had filled, and sworn to support the Constitution of the United States and the provisions of the organic act under which the Territory of Nebraska was created. For over thirty years prior to his election as governor he had enjoyed all the rights, privileges and immunities of a citizen of the United States and of the Territory and State, as being in law, as he was in fact, such citizen.

When he removed to Nebraska, that Territory was to a large extent a wilderness, and he spent years of extreme hardship upon the frontier, one of the pioneers of the new settlement and one of the inhabitants who subsequently formed a government for themselves. The policy which sought the development of the country by inviting to participation in all the rights, privileges and immunities of citizenship, those who would engage in the labors and endure the trials of frontier life, which has so vastly contributed to the unexampled progress of the nation, justifies the application of a liberal rather than a technical rule in the solution of the question before us.

We are of opinion that James E. Boyd is entitled to claim that if his father did not complete his naturalization before his son had attained majority, the son cannot be held to have lost the inchoate status he had acquired by the declaration of intention, and to have elected to become the subject of a foreign power, but, on the contrary, that the oaths he took and his action as a citizen entitled him to insist upon the benefit of his father's act, and placed him in the same category as his father would have occupied if he had emigrated to the Territory of Nebraska; that, in short, he was within the intent and meaning, effect and operation of the acts of Congress in relation to citizens of the Territory, and was made a citizen of the United States and of the State of Nebraska under the organic and enabling acts and the act of admission.

(2) Another and shorter course of reasoning leads to the same conclusion.

The respondent, in his answer, after stating that his father, on March 5, 1849, when the respondent was about fourteen years of age, made before a court of the State of Ohio his declaration of intention to become a citizen of the United States; and averring " that his father for forty-two years last past has enjoyed and exercised all of the rights, immunities and privileges and discharged all the duties of a citizen of the United States and of the State of Ohio, and was in all respects and to all intents and purposes a citizen of the United States and of the State of Ohio;" and particularly alleging his qualifications to be a citizen, and his acting as such for forty years, voting and holding office in that State; further distinctly alleges " on information and belief, that prior to October, 1854, his father did in fact complete his naturalization in strict accordance with the acts of Congress known as the naturalization laws so as to admit and constitute him a full citizen of the United States thereunder, he having exercised the rights of citizenship herein described, and at said time informed respondent that such was the fact."

As the allegation last quoted sets up a right and privilege claimed under the laws of the United States, this court must determine for itself the question of the sufficiency of this allegation, and is not concluded by the view taken of that question by the Supreme Court of Nebraska. In the words of Mr. Justice Miller, speaking for this court: "The question whether a plea sets up a sufficient defence, when the defence relied on arises under an act of Congress, does present, and that necessarily, a question of Federal law; for the question is and must be, does the plea state facts which under the act of Congress constitute a good defence?" *Mitchell* v. *Clark,* 110 U. S. 633, 645.

It is true that naturalization under the acts of Congress known as the naturalization laws can only be completed before a court, and that the usual proof of naturalization is a copy of the record of the court. But it is equally true that where no record of naturalization can be produced, evidence that a person, having the requisite qualifications to become a citizen, did in fact and for a long time vote and hold office and exercise

rights belonging to citizens, is sufficient to warrant a jury in inferring that he had been duly naturalized as a citizen. *Blight* v. *Rochester*, 7 Wheat. 535, 546; *Hogan* v. *Kurtz*, 94 U. S. 773, 778. And by the constitution of Ohio of 1851, none but white male citizens of the United States were entitled to vote, or to hold office. Art. 5, sec. 1; art. 15, sec. 4; Charters and Constitutions, 1472, 1478.

Such being the settled law, we can have no doubt that the fact that the respondent's father became a naturalized citizen of the United States before October, 1854, is well pleaded in the allegation in question, and is therefore admitted by the demurrer. The allegation "that prior to October, 1854, his father did in fact complete his naturalization in strict accordance with the acts of Congress known as the naturalization laws so as to admit and constitute him a full citizen of the United States thereunder," necessarily implies that he had been duly naturalized before a court as required by those laws. Specific allegations of the time and place at which, and of the court before which, he was so naturalized, or setting forth a record of his naturalization, would have been superfluous, and, in view of the respondent's imperfect information, as manifest upon the face of the allegation, of a transaction taking place so long ago, hardly possible.

Under this allegation, and the earlier allegations leading up to it, if traversed, a jury would have been warranted in inferring that the respondent's father became a citizen of the United States before October, 1854, and consequently that the respondent himself was likewise a citizen.

For this reason, without regard to any other question argued in the case, the respondent was entitled to judgment upon the demurrer.

MR. JUSTICE HARLAN, MR. JUSTICE GRAY and MR. JUSTICE BROWN concur in the conclusion of the court upon the latter course of reasoning only.

All the justices, except MR. JUSTICE FIELD, unite in holding that this court has jurisdiction of the case, and that upon this record James E. Boyd had been for two years, next preceding

his election to the office of governor, a citizen of the United States and of the State of Nebraska.

*The judgment of the Supreme Court of Nebraska is reversed, and the cause remanded to be proceeded in according to law and in conformity with this opinion.*

MR. JUSTICE FIELD dissenting.

I dissent from the judgment just rendered. I do not think that this court has any jurisdiction to determine a disputed question as to the right to the governorship of a State, however that question may be decided by its authorities. I agree that the States of the American Union are not in all respects independent political communities; I agree that they do not possess that supreme political authority which would entitle them to be called sovereign States in the full sense of those terms, as they are often designated. They are qualified sovereignties, possessing only the powers of an independent political organization which are not ceded to the general government or prohibited to them by the Constitution. But, except as such powers are ceded to the general government or prohibited to them, the States are independent political communities. This is not a matter of argument or inference, but is the express declaration of the Tenth Amendment. As forcibly stated by Mr. Justice Nelson, speaking for this court, "the general government, and the States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former in its appropriate sphere is supreme; but the States within the limits of their powers not granted, or, in the language of the Tenth Amendment, 'reserved,' are as independent of the general government as that government within its sphere is independent of the States." *The Collector Day,* 11 Wall. 113, 124. In no respect is this independence of the States more marked, or more essential to their peace and tranquillity, than in their absolute power to prescribe the qualifications of all their state officers, from their chief magistrate to the lowest official employed in the administration of their

local government; to determine the manner of their election, whether by open or secret ballot, and whether by local bodies or by general suffrage; the tenure by which they shall hold their respective offices; the grounds on which their election may be contested, the tribunals before which such contest shall be made, the manner in which it shall be conducted; and the effect to be given to the decision rendered. With none of these things can the government of the United States interfere. In all these particulars the States, to use the language of Mr. Justice Nelson, are as independent of the general government as that government within its sphere is independent of the States. Its power of interference with the administration of the affairs of the State and the officers through whom they are conducted extends only so far as may be necessary to secure to it a republican form of government, and protect it against invasion, and also against domestic violence on the application of its legislature, or of its executive when that body cannot be convened. Const. Art. IV, sec. 4. Except as required for these purposes, it can no more interfere with the qualifications, election and installation of the state officers, than a foreign government. And all attempts at interference with them in those respects by the executive, legislative or judicial departments of the general government are in my judgment so many invasions upon the reserved rights of the States and assaults upon their constitutional autonomy.

No clause of the Constitution can be named which in any respect gives countenance to such invasion. The fact that one of the qualifications prescribed by the State for its officers can only be ascertained and established by considering the provisions of a law of the United States in no respect authorizes an interference by the general government with the state action. Because an officer of a State must be a citizen of the United States it does not follow that the tribunals of the United States can alone determine that fact, and that the decision of the State in respect to it can be supervised and controlled by the Federal authorities. Nor is there any decision of this court that sanctions any such interference. There is a mere dictum in *Missouri* v. *Andriano*, 138 U. S. 496, 499, but no decision to that effect.

That case involved a contest between the parties for the office of sheriff of a county in Missouri. Among other things the constitution of that State declared that no person should be elected to any office in the State who was not a citizen of the United States. The relator claimed to have been in possession of the office since 1884 and entitled to continue until his successor was elected, commissioned and qualified; and that the respondent was not entitled to the office because he was not a citizen under the Constitution of the United States, having been born in Germany, and not having been naturalized. To this the respondent replied, admitting his foreign birth, and that he had never been naturalized under the laws of the United States, but claiming that under the act of Congress of 1802 he became and was a citizen by the naturalization of his father, that act providing that the children of citizens of the United States should, though born out of their limits and jurisdiction, be considered as citizens.

Under that act the Supreme Court of Missouri held that the respondent was a citizen of the United States. The case coming to this court, it was decided that when a decision of a state court was in favor of a right or privilege claimed under a statute of the United States, this court had no jurisdiction to review it, and the writ of error was accordingly dismissed. In the opinion delivered by the justice of this court it was said that had the judgment of the Supreme Court of Missouri been adverse to the claim of the respondent there could be no doubt of his right to a writ of error from this court to review its ruling — a question which was not in judgment, and what, therefore, was said respecting it was a mere dictum, without authoritative force.

The office of sheriff was not a right or privilege claimed under a law of the United States, but was a right or privilege claimed by the election under the laws of Missouri. The mere fact that it was necessary that the incumbent of the office should also be a citizen of the United States did not of itself give him a right to that office. It would, indeed, be a strange ruling to declare that an office which required the votes of the people of a State or of one of its districts was a right or privi-

lege under a law of the United States, because one of the qual-
ifications of the incumbent was that he should be a citizen of
the United States. The necessity of referring to a law of the
United States to ascertain what contestuted citizenship did
not make the respondent's right to the office dependent upon
that fact in any such sense as to bring it within the cognizance
of the Federal courts. Equally might it be said that a contested
claim to a seat in the legislature of a State could be brought
under their cognizance when the ground of contest happened
to be the disputed citizenship of one of the contestants. It is
true the answer to the attempted exercise of jurisdiction by the
courts in the latter case would be, that it is the settled law of
legislative bodies, and hitherto recognized in all our State con-
stitutions, that each house shall be the exclusive judge of the
election and qualification of its members. But no less settled,
and hitherto universally recognized in this country, is the law
which vests exclusive jurisdiction in each State over the elec-
tion, qualification and installation of its chief executive. There
seems to me to be the same inappropriateness and want of
authority in proceeding in the Federal courts for the office in
the one case as in the other.

My objection to the decision is not diminished by the fact
that there is no power in this court to enforce its decision upon
the State of Nebraska should resistance be made to it. Should
the incumbent declared by this court not to be entitled to the
office, refuse to surrender it and the state authorities should
stand by him in such refusal, what could be done about it?
He might well say, "I have been declared by the duly consti-
tuted authorities of the State, who alone have the right to in-
quire into the matter, to be entitled to the office, and I deny
the authority of the general government, or any department
of it, to interfere with my possession of the office." How
could this court in such case enforce its order? The presence
of the marshal with a posse to attempt it would be a pain-
ful exhibition of weakness. Would the court call upon the
general government to send an army into the State to force
upon it a governor who has been declared by its duly con-
stituted authorities not to be entitled to the office and to

oust the one who has been declared by them to be entitled to it?

I doubt whether any such proceeding would be successfully carried out or that the attempt to do it would be sustained by the Executive or by Congress or by the people anywhere. I can see only mischief and trouble to follow from the assertion of any such power over the authorities of a State as is claimed in this case. If the right of this court to interfere in this case can be sustained every candidate for office alleging that the successful party has not some qualification prescribed by statute, which can only be defined by reference to a Federal law, will claim a right to invoke the interference of the Federal judiciary to determine whether he ought or not to have been declared elected. There is always and naturally much bitterness and disturbing effect following interferences by the general government with affairs exclusively belonging to a State, and this result would be greatly augmented by recognizing the right here asserted as vested in the Federal judiciary. Few things in my judgment would have a greater tendency to destroy the independence and autonomy of the States, reduce them to a humiliating position, and engender constant irritation. Suppose the authorities of the State do decide erroneously as to the qualification of a person declared elected, if the State acquiesces in the decision, what public policy is to be subserved by invoking the interference respecting it of the Federal authorities, whom the decision does not concern?

There is already sufficient irritation from alleged interferences, whether true or not, in local matters by such authorities, without adding to it a thousandfold by subjecting the qualifications of state officers and their installation to unauthorized Federal scrutiny.

I therefore at the outset earnestly protest against the assumption of any such authority.