STATE, EX REL. JOHN WILLIAMS, APPELLEE, V. HARLEY G. MOORHEAD, APPELLANT.

FILED JULY 11, 1914. No. 18,241.

1. **Elections: REGISTRATION: DUTIES OF REGISTRATION OFFICIALS.** Chapter 36, laws 1913, examined, its important points set out in the opinion, and *held*: That the registration officers in cities covered by the act, in registering voters under the provisions of section 12a, act ministerially; that they are concluded by the answers of an applicant for registration, and that the record to be made under subdivision 10 of this section is to be determined by two of the supervisors of registration from the answer of the applicant to subdivision 7, and the evidence submitted or presented by him in answer to subdivisions 8 and 9.

2. ——: ——: **ACTS OF ELECTION COMMISSIONER.** That the acts of the election commissioner under the last paragraph of section 10, ch. 36, laws 1913, and under section 13, are quasi-judicial in character.

3. ——: ——: **CHALLENGE: EVIDENCE.** That when the commissioner enters or causes to be entered the word "challenge" opposite the name of a voter on the registration register, as provided in section 10, the proof necessary to be furnished by the voter, in order to have such challenge withdrawn, is the proof specified by section 10, viz., the filing of his affidavit setting forth facts showing the correctness of his registration, verified by two regularly registered voters of his election district, which proof is not required to be the production of his naturalization papers or a certified copy of the record of the court in which such voter was naturalized; but the affidavit must be treated as sufficient, if the facts stated therein are sufficient in substance, so that reasonable minds would draw the conclusion therefrom that the registration is correct.

REHEARING of case reported in 95 Neb. 80. *Former judgment of reversal vacated, and judgment of district court affirmed.*

FAWCETT, J.

This case is before us on rehearing. For a statement of the nature of the case reference is made to our former opinion in 95 Neb. 80. That the respondent is a conscientious official who desires to faithfully discharge the duties

of his office, according to law and not otherwise, and that he has a due regard for the public importance of his office, is shown by the opening statement in his brief, wherein he says: "The respondent welcomes a judicial interpretation of his official powers and functions as election commissioner. To protect the purity of the ballot and the elective franchise was the purpose of the act creating this office by the late legislature. The entire state of Nebraska and all citizens who have regard to civic honor are interested in its enforcement. In assuming the responsibility of the office, being desirous to perform the duties and exercise only the legitimate powers and functions imposed, this respondent respectfully submits his reasons, and what he considers as the law governing his action, in refusing to register, as a qualified voter, the relator." Recognizing the force of everything the respondent has above said, we have carefully considered the entire act (laws 1913, ch. 36), but will refer only to such sections as we deem pertinent to this investigation.

Section 8 provides: "The election commissioner, the chief deputy commissioner and such other deputies and employees as the election commissioner shall designate as supervisors of registration shall be supervisors of registration in said cities and shall serve as the election commissioner may direct." By this section it will be seen that the legislature recognized the fact that in a city of the size of Omaha there are a large number of election districts which, under the general supervision given to the election commissioner, would necessitate providing that officer with many deputies and assistants. The section also provides: "The election commissioner shall appoint an inspector for each election district." The section then goes into detail and provides that the inspector shall be present in the polling booth during all elections, acting as the personal representative and deputy of the election commissioner in the election district to which he should be assigned by the commissioner; makes it the duty of such inspectors to enforce the laws relating to elections, to see

that all proceedings are in accordance with instructions, rules, regulations and laws, and to challenge any voter "whose name does not appear on the election register or who he has reason to believe is impersonating a person whose name appears on the register or is attempting to vote illegally;" to see that the judges and clerks obey the law in every particular and conduct the canvass of the votes as provided by law and make prompt returns to the election commissioner.

Section 9 provides: "The election commissioner, starting as soon as practicable after this law becomes effective and again on the first day of September of every year in which is held a general state election, by the aid and assistance of deputy commissioners appointed by him as herein provided, not to exceed one for each district, shall visit every building in each city within said county wherein registration is required, and after diligent inquiry make true lists by streets, wards and voting districts of the name, age, occupation, place of occupation, residence and period of residence, at the time of taking of the canvass, of every male person twenty-one years of age or upward or who is or will be at the next ensuing general election a qualified voter.   Said commissioner shall designate in such lists all buildings used as residences by such male persons, in their order on the street where they are located by giving the number or other definite description of every such building so that it can be readily identified and shall place opposite the number or other description of every such building, the name, age, and occupation of every such male person residing therein at the time of the canvass, which lists shall be used for checking, revising and correcting registration."

It scarcely needs comment to demonstrate the purpose of this important section.  After faithfully complying with its terms, the commissioner and his corps of deputies would have in the office of the commissioner accurate data prepared by themselves of the actual residence of every voter in the city at the time of making their canvass.  This

data would be of valuable assistance to them in the dis-
charge of their further duties as provided in the next en-
suing section. It would effectually put a stop to whole-
sale registration by illegal voters on vacant lots and at
street numbers that have no existence.

Section 10 provides that as soon as he completed the
canvass, required by section 9, the election commissioner
should provide for a new general registration of all vot-
ers in the county who may be required by law to register;
that is to say, no attention should be paid to former reg-
istrations made prior to the enactment of chapter 36. He
is required by this section to furnish the necessary rec-
ords, "which records shall be known as the permanent reg-
istration register." He is required to keep this register
in duplicate marked respectively "original" and "dupli-
cate;" the original to remain in his office and the dupli-
cate to be the one taken to and used in the various elec-
tion districts for election purposes. It also provides that
any person properly registering as a voter shall not be re-
quired to again register unless he changes his residence.
Such change of residence it is provided shall operate as a
cancelation of his registration, and he must again register
before he can be permitted to vote. It also provides that
the office shall remain open during the usual business days
of the entire year for purposes of general registration and
for the transaction of the business of the office. The last
paragraph of section 10 will be referred to after we have
considered section 12a.

Section 11 empowers an election commissioner, deputy
commissioners, judges of election, supervisors of registra-
tion, and election inspectors to administer all oaths and
affirmations required or necessary in the administration
of the act.

Section 12 makes it the duty of the commissioner to
cause records to be prepared for the registration of names
and facts required by the act, these records to be known
by the general name of registers, and to be so arranged
as to admit of the entering under the name of each street

or avenue of each election district the number of each dwelling on any such street, the registers to be ruled so as to have columns entitled so as to cover all the points of information required to be set out in making the registration of the voter.

Section 12a provides: "The election commissioner or the deputy commissioner acting for him shall receive the application for registration of all such legal voters as shall personally apply for registration at the office of the commissioner or other places designated for registration, who then are, or on the day of election next following the day of making such application will be, entitled to vote. Any person serving as supervisor of registration shall administer to all persons who may personally apply to register the following oath or affirmation, viz.: You do solemnly swear or affirm that you will fully and truly answer all such questions as shall be put to you, touching your place of residence, name, place of birth, your qualifications as an elector, and all other questions provided for by the laws of this state affecting your right to register and vote therein. They shall then examine the applicant as to his qualifications as an elector, and, unless otherwise provided herein, shall immediately, in the presence of the applicant, enter in the registers the statements and acts as above set forth, and in the manner following, viz.:" First. The residence. Second. The name of the applicant in full, and providing that the name shall be kept by streets and avenues as far as the same can be done. "Third. Under the column 'Sworn' the word 'Yes' or 'No' as the case may be. Fourth. Under the column of 'Nativity' the state, country, kingdom, empire, or dominion, as the facts shall be stated by the applicant." Fifth. The color of the applicant. Sixth. The term of residence at the place indicated. "Seventh. Under the column 'Naturalized' the word 'Yes' or 'No' or 'Native' as the fact may be stated. Eighth. Under the column 'Date of Papers' the date of naturalization if naturalized, as the same shall appear by the evidence of citizenship or presented by the applicant

in compliance with the requirements of this article. Ninth. Under the column 'Court' the designation of the court in which, if naturalized, such naturalization was done, as the same shall appear by the evidence of citizenship presented or submitted by the applicant in compliance with the requirements of this article. Tenth. Under the column 'Qualified Voter' the word 'Yes' or 'No' as the facts shall appear and be determined by at least two (2) of the said supervisors. * * * Eleventh. Under the column 'Date of Application,' the month, day, and year when the applicant presented himself for registration. Twelfth. Under the column 'Signature of Voter' the applicant for registration shall be required to sign his name on both original and duplicate registers."

Section 13 provides: "The commissioner shall, upon the personal application of any person entered upon the registration record, correct any error therein, or whenever informed of any such error and after due investigation he may correct such error, and for said purpose may summon witnesses and compel their attendance to appear before said election commissioner at his office to give testimony pertaining to the residence, qualifications, or any other facts required to be entered in said registration list, which testimony shall be transcribed and become a part of the records of his office." It further provides that, if through any error of the election commissioner the name of any properly registered qualified voter failed to appear upon the election register of his election district, the inspector of election shall at the polling booth of such election district issue a certificate to such person which shall recite the facts and authorize the judges of election to receive his vote.

We will now give the concluding paragraph of section 10. We give it here for the reason that the duties therein enjoined upon the election commissioner are duties which are to be performed subsequent to the registration of the voters as provided by section 12a. It provides: "It is hereby made the duty of the election commissioner to ver-

ify the registration in each election district, through the
various inspectors, within the ten days next preceding
each and every general state and regular city election and
at such other times as the election commissioner may deem
necessary, and he shall thereupon enter or cause to be
entered the word 'challenge' opposite the name of any
voter reported by said inspector as unlawfully registered,
and such entry shall not be canceled nor the person so
challenged permitted to vote without evidence being pro-
duced in writing and filed with said commissioner or in-
spector showing the correctness of his registration, which
evidence shall be in the form of an affidavit, the filing of
which shall be entered thus 'affidavit' opposite the name of
the voter so challenged, which affidavit shall be signed by
the person challenged and by two regularly registered vot-
ers of the district and shall state facts sufficient to show
the correctness of his registration. Whereupon such com-
missioner or inspector shall make entry 'challenge with-
drawn' opposite the name of such voter. Upon the entry
of any such challenge against a person whose name ap-
pears upon the registration records, the commissioner shall
send a notice over his signature, through the mail, duly
stamped, to all such persons against whose names a chal-
lenge has been entered, at the address given upon said reg-
istration records, requiring such person to appear before
the election commissioner or inspector to verify his regis-
tration under oath, and upon his failure so to appear with-
in one year thereafter, or to file with said commissioner
an affidavit setting forth a good and sufficient reason for
not appearing in person, and setting forth facts showing
the correctness of such registration verified by two regis-
tered voters of the same district as such voter, the said
registration shall be canceled. Two copies of the registra-
tion record of each district as it shall be made up and ap-
pear ten days before any election, shall be provided by
said commissioner for the use of judges and clerks of elec-
tion in their respective districts on election day, said cop-
ies to be known as election registers."

Considering these various sections of the act in the order in which we have set them out, we think the intention of the legislature is made clear, and that the point urged in the briefs, as to whether the commissioner acts judicially or ministerially, is also made clear. In the performance of the duties prescribed by section 12a he or his deputy commissioner acts ministerially. In the performance of the duties prescribed by the last paragraph of section 10 his acts are quasi-judicial; and the same is probably true when acting under that portion of section 13 above quoted. The controversy in this case arises under subdivisions 7, 8, 9 and 10 of section 12a. So far as the record before us discloses, the transaction of July 12, 1913, when the relator appeared at the office of respondent for registration, was a very informal affair. No record was made of the application for registration or of the reasons why it was denied; nor was the oath administered by the commissioner. The evidence taken in the district court shows that the relator told the respondent that he was born in Ireland, that he came to this country with his father while still a minor, that his father was naturalized before he was 21, and that he himself was naturalized in Boston, Suffolk county, Massachusetts; that he told respondent that his papers were lost and had been for many years; that he lost them before he came to Omaha about 35 years ago; that he did not tell respondent when he was naturalized; that respondent asked him no questions about it; that when he told respondent that his naturalization papers were lost respondent stated to him that he could not register him without his papers, and for that reason refused. His testimony further shows that he had lived in Nebraska 36 years and had voted at all state, county and city elections during those years; that he had registered every year since the law requiring registration was first adopted; that he had never during any of those years been required to produce any documents of citizenship or declaration to become a citizen.

The question then is: What is the construction which should be placed upon subdivisions 7, 8, 9 and 10 of sec-

tion 12*a*? We think the fair construction is that, when the applicant answers subdivision 7 "Yes," the officer taking his answers to the questions being propounded is concluded by his answer. The fact that the applicant may not be able to give the exact date when or the precise court in which he was naturalized, as contemplated by subdivisions 8 and 9, is not sufficient to destroy the force of his affirmative answer to subdivision 7. There are undoubtedly thousands of old men in this country who were naturalized in the early days of its settlement, but who have since lost their "papers" and could not now state when or by what court they were naturalized; and there are undoubtedly hundreds of thousands of men whose fathers were naturalized many years ago and before they were 21 years of age who have never seen their fathers' naturalization papers and have not the remotest idea of when and where they were naturalized, but do know that years before their fathers died they had been voting as citizens of this country. We think the answer to subdivision 10, under the column "Qualified Voter," so far as the act of registration is concerned, must be based upon the answer to subdivision 7; that when the applicant, who is under oath, answers that he is a naturalized citizen, the record under subdivision 10 should show the answer "Yes" to the question as to whether or not he is a qualified voter, *unless,* in answering subdivisions 8 and 9, the evidence "submitted or presented" by the applicant, *itself,* shows that the answer to subdivision 7 is untrue. It is also clear from the wording of subdivision 10 itself that the determination of the question as to whether the word "Yes" or the word "No" shall be entered is not for the determination of the commissioner alone. That fact must be determined by at least two of the supervisors. It was argued by counsel for relator that the commissioner cannot act in this capacity at all, but in this we think they are in error, as shown by the quotation above from section 8. The reason of the legislature for providing that this fact shall be determined by at least two of the supervisors becomes apparent when we

consider the requirements of section 4 of the act, which provides that the election commissioner shall appoint a chief deputy commissioner who shall be a member of a political party other than the one with which the election commissioner affiliates. That section also provides that the commissioner shall appoint such other deputies, inspectors of election, supervisors of registration, peace officers to serve at election, and such other assistants as may be necessary for the performance of the duties of his office, the registration of voters and the conduct of election in such counties, with the proviso that "such employees shall be divided between all political parties as nearly as practicable in proportion to the number of votes cast in said county at the preceding general election for the office of governor by said parties, respectively." Briefly, therefore, we think that under section 12a the registration officers are acting ministerially; that they are bound to record the answers as given by the applicant and enter under the column "Qualified Voter" "Yes" or "No" in accordance with the answers given by the applicant. If the answers of the applicant are falsely or fraudulently given, so that he has secured a registration to which he is not entitled, the inspector for the election district, in which the applicant's registration shows him to be a resident, has from then until the time the election commissioner is called upon to verify the registration in each election district, which shall be within ten days next preceding each general election, to reach a conclusion as to whether there is any doubt as to the applicant's right to vote. By the last paragraph of section 10 quoted above, it is made the duty of the election commissioner, through his various inspectors, to verify the registration, and when he has performed that duty through his inspectors, if he has doubt about the right of any person whose name appears upon the registration lists to vote, it is his duty to "enter or cause to be entered the word 'challenge' opposite the name of any voter reported by said inspector as unlawfully registered." When that word is entered opposite the name

State, ex rel. Williams, v. Moorhead.

of any voter, it then becomes the duty of the commissioner to send the voter challenged a notice over the signature of the commissioner, through the mail, duly stamped, requiring such person to appear before the election commissioner or inspector to verify his registration under oath, etc., and until the voter has made the showing required, so as to cause the entry "challenge withdrawn" to be made opposite his name, he cannot vote. Thus careful provision is made for the protection of the purity of the ballot, and a safeguard furnished against unlawful registration.

This brings us to the crucial point in the case, viz.: When a naturalized citizen fails to produce his naturalization papers or a certified copy of the record of his naturalization, may the election commissioner refuse to withdraw the "challenge" entered opposite his name? It is argued that the rule of the best evidence obtainable is the one to be applied, and that the fact of naturalization cannot be proved by parol. *State v. Boyd*, 31 Neb. 682, 710, with other cases, is cited in support of that contention. It is true that our opinion in that case so holds, and Governor Boyd was ousted from the office of governor by this court; but our judgment was reversed by the supreme court of the United States in *Boyd v. State of Nebraska*, 143 U. S. 135, in which the citizenship of Governor Boyd was sustained upon oral proof, as shown in that opinion. While the rule contended for may be and unquestionably is the rule in proceedings before a court of judicature, in the absence of a statute on the subject, it does not apply here, for the reason that the legislature, by the act under consideration, has determined the kind of proof required. By section 10, above set out, it will be seen that, when the commissioner has caused the word "challenge" to be entered opposite the name of any voter, such entry shall not be canceled nor the person so challenged be permitted to vote without evidence being produced in writing and filed with the commissioner or inspector, showing the correctness of his registration, "which evidence shall be in the form of an affidavit, the filing of which shall be entered

thus 'affidavit' opposite the name of the voter so chal-
lenged, which affidavit shall be signed by the person chal-
lenged and by two regularly registered voters of the dis-
trict, and shall state facts sufficient to show the correct-
ness of his registration. Whereupon such commissioner
or inspector shall make entry 'challenge withdrawn' oppo-
site the name of such voter." This section goes on and
provides further that when the entry of such challenge
appears upon the registration records and the commis-
sioner has sent notice, as shown by the quotation above
given, for the voter to appear before him to verify his reg-
istration under oath, and he fails so to appear within one
year thereafter, or to file with the commissioner an affi-
davit setting forth a good and sufficient reason for not ap-
pearing in person, "and setting forth facts showing the
correctness of such registration verified by two registered
voters of the same district as such voter, the said registra-
tion shall be canceled." So that in two places in this
section it is provided that upon the filing of an affidavit
setting forth facts showing the correctness of such regis-
tration, verified by two registered voters of the district,
the challenge *shall* be withdrawn.

The proof thus required does not call for furnishing
either his original naturalization papers or certified cop-
ies of the record thereof. It simply calls for the furnish-
ing of an affidavit stating the facts that entitle him
to vote, which, in the case of one not native born, would
be that he has been naturalized or has declared his inten-
tion to become a citizen. The proof that his affidavit is
true is not required to be the furnishing of his papers, but
the affidavit of two regularly registered voters of his dis-
trict. But, it may be asked, what are the facts that must
be sworn to by the voter in his affidavit and verified by
two regularly registered voters in his precinct, which
should be considered "sufficient to show the correctness of
his registration?" Of course, the applicant may attach to
his affidavit his naturalization papers; or he may state in
his affidavit that his naturalization papers are lost and

attach a certified copy of the record of the court in which he was naturalized. In either of such cases the proof would be conclusive. If, however, he is unable to furnish this documentary evidence, his affidavit should so state, and then set out such facts as are sufficient to satisfy a reasonable person that he is a citizen and entitled to vote. When such proof is furnished, the applicant would be able to protect himself against any erroneous refusal of the election commissioner to withdraw the challenge, by proper proceedings prosecuted in a court of competent jurisdiction. We are unable to see how proof of this character will open the door to fraud where a naturalized citizen is attempting to register, any more than it would if one claiming to be native born were making application. If upon his verification of the registration the inspector should report to the election commissioner that A. B., who is registered under section 12a as "native," is not entitled to vote, for the reason either that he is not native born or that he has not lived in the state, county or precinct for the required length of time, it would be the duty of the commissioner to "challenge" him in precisely the same manner as he would challenge the naturalized citizen, in which case each would be required to purge himself of the challenge in precisely the same manner, viz., by filing his affidavit signed by himself and by two regularly registered voters of his district. The only redress the state can have, or has ever had under similar laws, as against illegal registration and illegal voting, is under the criminal laws of the state.

This brings us to the judgment entered by the district court, which was that a peremptory writ of mandamus issue therein against the respondent commanding him, as election commissioner in and for Douglas county, Nebraska, "forthwith, on the application of the relator, to receive the oral testimony, under oath, of said relator, for the purpose of establishing the relator's citizenship by naturalization under the naturalization laws of the United States, and that the respondent accept said oral statements,

State, ex rel. Williams, v. Moorhead.

under oath, as competent and sufficient evidence to establish the relator's naturalization for the purpose of registering as an elector under the laws of the state of Nebraska." The effect of this judgment is simply that the respondent is required to proceed under section 12a by administering the oath to the relator, taking his answers to the questions required by that section, and, for the purpose of registration, to accept his statements under oath as true and to register him as a voter. This judgment will not and does not attempt to preclude the respondent and his inspectors from investigating the relator's right to register, or from challenging his right to vote, as provided in section 10, above set out.

After a careful consideration of the case, we are convinced that the judgment of the district court is right. Our former judgment is therefore vacated, and the judgment of the district court is

AFFIRMED.

ROSE, J., not sitting.

LETTON, J., concurring.

While I think that part of the judgment of the court commanding the respondent to accept the oral statements of the relator under oath as sufficient evidence goes too far, under the construction of the law laid down in the opinion, this is really immaterial, since the judgment was not superseded, and it was stated at the hearing that it had been executed. In other respects the district court properly held for the relator. He was entitled to be sworn and to have his answers to the queries of the registration officers taken down, considered, and a record made. Whether the judgment of the district court is affirmed or reversed merely relates to the matter of costs, and, since the relator was entitled to much of the relief sought, the respondent should bear this burden.

SEDGWICK, J., dissenting.

The majority opinion decides that, when the election commissioner reaches the final conclusion as to whether

the applicant for registration is a legal voter, if the facts, which they say can be shown only by affidavit, "are sufficient in substance, so that reasonable minds would draw the conclusion therefrom that the registration is correct * * * sufficient to satisfy a reasonable person that he is a citizen and entitled to vote," the applicant must be regarded as a qualified voter. This, of course, contemplates that the commissioner will ascertain and decide whether the facts proved are sufficient, and in doing this he must use a reasonable discretion, so that in the final determination of the matter he is not concluded by the unsupported oath of the applicant as to his naturalization. This was the decision in the former opinion. 95 Neb. 80. It was there expressed in these words: "The relator understands this statute to mean that these preliminary answers under oath are conclusive upon the commissioner, so that, if the applicant in that examination says that he is naturalized, the matter is thereby concluded. We do not so understand the statute." The majority opinion nevertheless affirms the judgment of the district court, but that judgment clearly is that, even in doubtful cases, when reasonable minds might conclude from the facts in evidence that the applicant had never been naturalized, the commissioner is concluded upon that fact by the oath of the applicant.

The petition for the writ of mandamus asks that the respondent be commanded "to receive under oath his (the relator's) oral statements for the purpose of establishing his citizenship, and to accept such oral statements under oath as competent to establish citizenship under the election and registration laws of the state of Nebraska." The alternative writ commands the respondent "to register said relator as a legal voter in the city of Omaha, Douglas County, Nebraska, in accordance and conformity with the registration and election laws of this state." The finding of the trial court was "that the election commissioner has no authority to require naturalized citizens to produce their naturalization papers or other documentary

evidence of their citizenship," and the judgment was: "Now, therefore, it is considered, ordered, adjudged and decreed by the court that a peremptory writ of mandamus issue herein against the respondent commanding him, as election commissioner in and for Douglas county, Nebraska, forthwith, on the application of the relator to receive the oral testimony, under oath, of said relator, for the purpose of establishing the relator's citizenship by naturalization under the naturalization laws of the United States, and that the respondent accept said oral statements, under oath, as competent and sufficient evidence to establish the relator's naturalization for the purpose of registering as an elector under the laws of the state of Nebraska."

The majority opinion and the decree consider all of these proceedings are for the purpose of a preliminary or tentative list of voters. This judgment, it assumes, can and really must be corrected by a challenge. The commissioner must send out his inspectors, and they must report if there is any doubt about the applicant's naturalization, and a challenge must then be entered upon this supposed preliminary register. The applicant may then attach his naturalization papers or a certified copy of the record of his naturalization, if he has them. If not, he and his two neighbors, "legally registered voters" of his district, must state the facts within their knowledge, and, if the commissioner finds that the facts stated ought to "satisfy reasonable minds," he withdraws the challenge and relator can vote; but, if he finds that the facts are not sufficient to satisfy reasonable minds that relator has been naturalized, he will not withdraw the challenge and the relator cannot vote, notwithstanding the prayer of his petition and the finding and decree of the court, which is now affirmed. This surely is inconsistent. By these findings and decree he is commanded to receive relator's oath as proof of naturalization, and, if the commissioner should challenge him or otherwise refuse to qualify him as a voter on the ground that the facts in evidence were not suffi-

cient to "satisfy a reasonable person that he is a citizen and entitled to vote," he would be in contempt of court. And so it would seem that, under the law as finally stated in the opinion, the judgment of the district court should be reversed.

That fraud has been perpetrated in elections in the large cities of the country is notorious. A foreign-born resident taking no special interest in an election, and brought to the polls by those who were especially interested, could answer that he had been naturalized, and without doubt many such votes were improperly received. The legislature in the act of 1913 (laws 1913, ch. 36) attempted to remedy this and many other evils in elections in the city of Omaha. The act is a comprehensive one. It creates the office of election commissioner, and, as pointed out in our former opinion (95 Neb. 80), clothes him with unusual and extraordinary powers, and imposes upon him onerous and exacting duties. To analyze the act and ascertain with precision the powers and duties of the election commissioner as intended by the legislature is a tedious and in some respects an unusually difficult labor. To settle one of the important questions that arise as to the power and duties of the commissioner it was thought best to bring this test case. The election commissioner, who appears to have no motive other than to perform his duty as the law intends, and Mr. Williams, who appears to be a frank and honorable citizen, interested in good government and the just enforcement of the laws of his adopted country, and other good citizens, appear to have been in doubt whether the practice which had obtained of taking the unsupported oath of a foreign-born resident as final and conclusive proof that he had been naturalized was still the law under this new act. This was the question which they sought to raise and present to the courts. In the briefs the relator says: "The appellant (the election commissioner) contends that under subsections 8 and 9 he finds authority to demand documentary evidence (of naturalization)." And the respondent stated

the question to be: "Can the respondent, as registrar of voters, demand the production of naturalization papers as the best evidence of citizenship?" If, in raising this important question as to the duty of the election commissioner to exercise his discretion, they had selected a relator who was an "undesirable citizen," and who had probably never in fact been naturalized, but was ignorant and apparently willing to impose upon the election commissioner with a false oath, instead of selecting a desirable citizen, in whose favor the discretion of the commissioner ought and ordinarily would be exercised, there might be no temptation to suggest the old saw that a hard case makes bad law. As it is, the opinion of the majority is that the election commissioner must receive the "oral testimony, under oath," of the applicant for registration "for the purpose of establishing the relator's citizenship by naturalization under the naturalization laws of the United States, and that the respondent accept said oral statements, under oath, as competent and sufficient evidence to establish the relator's naturalization for the purpose of registering as an elector under the laws of the state of Nebraska." This construction of the statute, it seems to me, is not without some difficulties. The opinion of the majority then says that this is required by section 12a of the act, and that the election commissioners may then challenge the voter under section 10. Is the record required by section 12a the "permanent registration register?" Is the provision of section 10 intended as a review of the decision of the election commissioner in registering the applicant as a voter? Answers to these two questions appear to present great difficulties in the way of holding that the election commissioner is bound in all cases by the oath of the applicant.

The election commissioner is required to make several distinct records; one of them is the "permanent registration register." He first, with the assistance of his deputies investigates the whole field for himself. He visits every building in each city in the county and makes "true

lists" of the facts specified in section 9 as he and his depu-
ties find them to be. He next makes the record described
in section 12, "known by the general name of register."
This is the record of the statements of the applicant for
registration of the details of the facts in regard to his
qualifications. He is first sworn and his answers are taken
down as he makes them. This is, of course, the record in-
tended in section 12a. Any person serving as a super-
visor of election shall question the applicant and "imme-
diately in the presence of the applicant" enter in the reg-
ister his statements, and when it is done the applicant
signs it as his statement. There is a slight discrepancy, in
that section 12 provides for a column entitled "Date Reg-
istry Approved," and 12a assumes the title to be "Quali-
fied Voter;" but as 12a says that these answers shall be
entered "in the registers," and does not require any other
register for that purpose than the one provided for and de-
fined in section 12, "to be known by the general name of
register," as distinguished from the "permanent registra-
tion register," it is apparent that "approving the registry"
and entering under the word "qualified" the word "Yes"
are one and the same thing, and as this may all be done by
"any person serving as supervisor" without consulting the
commissioner of election, and even without his knowledge,
and no other evidence on any matter is taken or allowed
except the personal statement of the applicant himself, it
is impossible that this record could be considered author-
itative or final, or in any respect take the place of the
"permanent registration register." Two supervisors, pos-
sibly of different political parties, are required to be pres-
ent, and know that the record is properly made, and that
all required questions are properly answered, so that the
record on its face shows the applicant qualified. These
statements of the applicant and the preliminary lists of
facts as entered by the election commissioner are before
the election commissioner when he receives evidence and
ascertains whether the applicant is a legal voter and makes
the "permanent registration register" provided for in sec-

tion 10. Sections 13 and 14 of the act also contemplate that there shall be "election registers." There is to be one of these for each election district. They are not the "permanent registration register" provided for in section 10, nor the records "to be known by the general name of register," provided for in sections 12 and 12*a*. There are only an original and one duplicate of the "permanent registration register." The number of the record "known by the general name of register" is perhaps uncertain, but there is to be an "election register" for each election district.

The election commissioner next receives applications for registration, passes upon them, and, if he finds them to be voters, registers them in the "permanent registration register." The permanent registration registers shall be kept in duplicate and marked respectively "Original" and "Duplicate." How, then, can the election commissioner be required to "proceed under section 12*a* by administering the oath to the relator, taking his answers to the questions required by that section, and, for the purpose of registration, to accept his statements under oath as true and to register him as a voter?"

It was not the purpose of this test case to raise questions as to the form of the record of the applicant's answers to the questions which the law requires shall be put to him, "known by the general name of register." The purpose was to test the question whether the election commissioner in determining who are legal voters might in any case require a foreign-born applicant for registration to "submit or present" his naturalization papers, or whether the personal oath of the applicant is conclusive upon that question. This is stated in the briefs by both parties to be the point involved in the litigation.

The opinion says: "This judgment will not and does not attempt to preclude the respondent and his inspectors * * * from challenging his right to vote, as provided in section 10, above set out." This judgment, then, will not in practice accomplish much. The election commis-

State, ex rel. Williams, v. Moorhead.

sioner is compelled to register the applicant as a voter if he states that he has been naturalized; but the election commissioner may at once challenge him, and then his own oath is not sufficient. He must prove that he has been naturalized by two witnesses. It will probably not often happen that there are two "regularly registered voters of the district" who were witnesses to his naturalization and can swear to the fact that the applicant was naturalized. Unless there are two such witnesses, the challenge is not withdrawn and the party is not allowed to vote, and so this action and this decision, in most cases at least, will not help the proposed voter. This unfortunate result leads us to the question above proposed: Is the challenge provided for in section 10 intended as a review of the decision of the election commissioner that the applicant is a legal voter, after hearing evidence and after he has registered him as a voter on the "permanent registration register?"

The election commissioner is required to send out his inspectors before each general election, and at other times if he deems necessary, who are to report any voter "unlawfully registered." Such voter must be challenged, and must then furnish proof by his own oath and the oaths of two other "regularly registered voters" of the same election district with himself "showing the correctness of his registration." Does this mean that he must re-establish in this manner the facts that were investigated when he was admitted as a voter and duly registered on the "permanent registration register?" There are apparent difficulties in the way of such a conclusion. Why limit him to two "regularly registered voters" of his own election district? Why not allow the election commissioner to call witnesses generally, as he does when he determines that he is a legal voter and registers him as such, and as provided in section 13? It seems that in trying the challenge no oral evidence is allowed. The opinion says that his naturalization papers may be attached. The evidence taken by the election commissioner on the first hearing is not preserved and is excluded. Is it reasonable to suppose that the legislature

intended that the election commissioner should first determine upon satisfactory evidence that the applicant had been naturalized, and, if afterwards there was doubt of that fact, the question should be so summarily retried and the evidence taken in the formal investigation go for nothing, unless the applicant could bring two regularly registered voters of his district who knew and could swear to the fact of his naturalization?

It would seem more reasonable to suppose that these inspectors are sent out before each election to ascertain whether any changes have taken place that would disqualify any voter, such as change of residence, conviction of felony, or perhaps some minor matter that would be required to be recorded so that the voter might be identified and could not be impersonated. His neighbors would be more likely to know the facts in regard to such disqualifications than to know the facts in regard to his naturalization, which he might assert had happened many years before. It seems to me that the majority opinion places the conclusion on impossible grounds. The election commissioner ought to exercise a reasonable discretion, and when the facts, well established, are such that all reasonable minds must agree that the applicant of foreign birth has been duly naturalized, that should be sufficient; but when a vagrant of foreign birth, who apparently is ready to swear to anything that would permit him to vote, especially in regard to a matter which he places so remotely in the past, and which in the nature of things it would be practically impossible to disprove, and so can be sworn to with safety, the conditions being such that all reasonable minds must refuse to believe him, the election commissioner ought not to be compelled to register him as a voter, but might in his discretion require him to "present or submit" his naturalization papers.